COUNTY OF SCOTTS BLUFF, NEBRASKA, APPELLEE, V. MARVIN HUGHES AND DOROTHY HUGHES, HUSBAND AND WIFE, APPELLANTS, IMPLEADED WITH WILLIS YOUNG ET AL., APPELLEES.

276 N. W. 2d 206

Filed March 13, 1979. No. 41813.

R. L. Gilbert, for appellants.

W. H. Kirwin, Deputy County Attorney, for appellee County of Scotts Bluff.

Heard before KRIVOSHA, C. J., BOSLAUGH, and BRODKEY, JJ., and RONIN and NORTON, District Judges.

NORTON, District Judge.

This is a quiet title action involving a boundary dispute between the County of Scotts Bluff, as plaintiff, and three named individuals as defendants. The matter was tried to the court and judgment was entered quieting title to the disputed lands in the plaintiff. Two of the defendants appeal. We reverse and remand.

The petition of the plaintiff alleges generally that it is the owner of certain described lands; that the defendants, Dorothy Hughes and Marvin Hughes, through an agreement of sale with one Roy Croft for the purchase of adjacent real estate, were claiming an adverse interest in plaintiff's real estate; that the defendant, Willis Young, claimed an interest in plain-

tiff's real estate inferior to and not adverse to the plaintiff; and that the conveyance (agreement) by Croft to the defendants Hughes of any interest in plaintiff's real estate was void for lack of title on the part of Croft. Plaintiff prayed for title to the disputed lands to be confirmed in it.

By way of answer, the defendant Young generally denied and alleged an option to purchase a portion of the lands in dispute through an agreement with the defendants Hughes. The plaintiff, in its reply, denied this affirmative allegation.

The defendants Hughes in their answer generally denied plaintiff's claims and alleged that the boundary line between plaintiff's real estate and defendants' real estate had been established by a fence; that a conveyance in 1932 through which the plaintiff had acquired title was intended only to convey to said fence line; that in 1968 the plaintiff caused the disputed lands to be added to the tax rolls and thereafter taxes were assessed against those defendants and their predecessors in title; and that it should now be estopped from claiming any interest or title in the same. In a cross-petition, the defendants Hughes set forth three causes of action, raising the following issues: First, that the defendants and their prececessors in title had exercised open, continuous, exclusive, notorious, and adverse possession of the disputed lands prior to plaintiff's ownership of such real estate, and continued to do so thereafter until the date of this action; second, that the fence previously referred to had been recognized by the parties and their precedessors as a common boundary from the time of the construction until the commencement of these proceedings; and third, that the plaintiff had been responsible for a diversion in the North Platte river, (which created this problem) and notwithstanding, the defendants Hughes were still the owners of government survey Lots 1 and 2, which would include the disputed lands. Defendants

prayed for title to be confirmed in them.

By way of reply to defendants Hughes' answer, the plaintiff denied that a deed of conveyance upon which it derived its title contained any reservation, or was ambiguous in any fashion; that the placing of the disputed lands on the tax rolls was at the instance of the claimants and raised an estoppel; and that the conveyances upon which the plaintiff based its title conveyed the disputed lands as accretions to their real estate. For answer to the defendants' cross-petition, the plaintiff alleged: As to the first cause, that the defendants were precluded from asserting adverse possession against the plaintiff by reason of the fact that each derived part or all of his title through a common predecessor in title, and by virtue of the provisions of section 39-1404, R. R. S. 1943; and as to the second and third causes, that the allegations were denied and were incompetent, irrelevant, and immaterial to any issue.

On the basis of these pleadings, a written stipulation, and a visit to the premises, the matter was submitted to the trial court. From an examination of the record, we can reasonably determine the following facts to be true.

Plaintiff derives its title to the hereinafter described real estate from two conveyances made, executed, and delivered in 1932. The first conveyance, of an undivided one-half interest, was from J. R. Croft and wife, conveying 55 acres, more or less; the second conveyance, of an undivided one-half interest, was from the heirs of Herman G. Stewart, conveying 50.64 acres, more or less. Since 1932, the plaintiff has been the record owner and in possession of that tract of land generally described as Lots 1 and 2 "South," being a part of Section 28, Township 23 North, Range 57 West of the 6th P.M., Scotts Bluff County, Nebraska.

Defendants Hughes derive their claim of title to the hereinafter described real estate by virtue of a

contract of sale with one Roy Croft, dated November 30, 1970. Briefly, this agreement provides for the payment of annual installments each year for 15 years from March 1, 1971. Roy Croft derived his title from his father and mother, J. R. Croft and Daisy G. Croft, in 1939 through a conveyance calling for transfer to him of 161.70 acres and setting forth the following general description: Lots 1 and 2, "North," being a part of Section 28, Township 23 North, Range 57 West of the 6th P.M., Scotts Bluff County, Nebraska.

J. R. Croft derived his title to the above described real estate from Frank E. and Mary F. Powell, husband and wife, in 1923. Therefore, in 1932, when J. R. Croft and his wife conveyed to the plaintiff an undivided one-half interest in Lots 1 and 2 "South," they were also the record title owners of Lots 1 and 2 "North."

Prior to 1932, Lots 1 and 2 "North" were separated from Lots 1 and 2 "South" by the North Platte river flowing in two separate channels at this point, and between these channels there existed an island. At some time prior to 1907, a fence was constructed east to west through this island, located roughly on the half-section line of Section 28. This fence had the effect of dividing the island between the respective owners of the "north" and "south" parts of Lots 1 and 2. This fence remained in the same location at the time of trial of this matter and, except for necessary repairs, had never been changed or altered from the time of its original construction. Also prior to 1932, the two channels of the river were crossed by two wooden bridges which were located on the north/south boundary line on the east side of Section 28.

At some date after 1921, but prior to 1932, the wooden bridges were removed and in their place a large earthen dam was constructed across the south channel of the river, and a bridge constructed across

the north channel. At about the same time, a fill was placed in the south channel at the head of the island. The record does not disclose who was responsible for this fill. The effect of this construction was to divert all the water flowing in the river to the north channel. This was the situation that existed in 1932, when the plaintiff became the owner of the real estate first above described, and this situation lays the basis for plaintiff's claim that the meander line of the river had been shifted from its previous location to the center of the north channel prior to its possession, thereby joining all of the island with Lots 1 and 2 "South."

Subsequent to 1907 and prior to 1932, the owners of Lots 1 and 2 "North" exercised full possession and control of that portion of the island lying north of the fence line mentioned above.

Subsequent to 1932, J. R. Croft, Roy Croft, and the defendants Hughes, each during their particular periods of possession of the north part of the island, made repairs to the fence to keep it in condition so that livestock could be pastured on the north part thereof. These particular individuals did in fact use this real estate openly and notoriously for that purpose and under a claim of ownership. In defendant's exhibit 5, Roy Croft stated that in 1941 the county attorney of Scotts Bluff County directed a letter to his father, J. R. Croft, advising the latter that the county owned the north part of the island. Thereafter Roy Croft contacted the county attorney who then told him to keep away from the disputed lands, and his reply was that he had "* * * been in there for 40 years and he was going to stay until some court says to get out * * *." No action was apparently taken by the plaintiff.

During his possession of the north one-half of this island (which would have been after 1939), Roy Croft leased a portion thereof for 7 years to one John Bar-

rett for a ready-mix plant. In 1966, he leased a portion to one Lloyd Mathson for gravel mining, and the Mathson lease passed to the defendant Young, who was still in possession at the time of this suit, under a lease/purchase agreement with defendants Hughes and Croft. During this time, Young sold gravel to the plaintiff which was mined from the disputed lands and which the plaintiff used for road purposes. Further, it is undisputed that during his period of possession Roy Croft leased the north portion of the island for hunting and trapping purposes to various individuals at various times.

During the period from 1932 to 1968, the plaintiff would upon occasion verbally object to the ownership claim of Roy Croft, but did not at any time exercise any physical control over the north part of the island nor did it attempt to have him ejected by any legal proceedings. The record is clear that the plaintiff never took possession of any of the disputed lands prior to this suit.

In 1968, the county assessor of Scotts Bluff County placed the disputed lands (north part of island) on the tax rolls by adding them to Lots 1 and 2 "North," and taxes were assessed on the same for that year and for each year thereafter until the commencement of this action. The record discloses that these taxes were paid without protest by Roy Croft and the defendants Hughes. The plaintiff has affirmatively alleged that the lands were added to the tax rolls at the instance of the defendants Hughes and, in its response to certain interrogatories, states "* * * that the request for the inclusion of these lands as taxable lands of the Defendant Hughes was made at the request of the Defendant Hughes,' and was not caused by or the action of the County of Scotts Bluff other than to a request therefore [sic]." But, despite this allegation, we note the defendants Hughes had no claim of ownership in 1968, and obviously could not have authorized such action.

On October 26, 1977, following a visit to the premises, the trial court entered judgment finding generally in favor of the plaintiff and quieting title to the disputed lands in the plaintiff. The defendants Hughes and the defendant Young thereafter filed their motion for a new trial asserting seven grounds for error. The motion was overruled and the defendants Hughes thereafter perfected an appeal to this court on the following assignments of error: (1) The trial court erred in failing to fix the fence line described in defendants' answer as the common boundary line between the property of the respective parties; (2) the trial court erred in failing to quiet title to the disputed lands in the defendants; (3) the trial court erred in determining that deeds executed in 1932 conveyed to the plaintiff the disputed lands; (4) the trial court erred in failing to find that adverse possession of the disputed lands subsequent to 1932 divested plaintiff of title, if any, in the disputed lands which it might have acquired by such deeds in 1932; (5) the trial court erred in failing to find that the plaintiff is estopped to claim the disputed lands; and (6) the trial court erred in failing to quiet title in the defendants in the land to the north of the thread of the stream of the North Platte river as it existed prior to 1921 and fixing the common boundary line as the thread of such stream at the time of the diversion made in 1921.

It is not necessary to discuss each of these assignments of error, some of which are mutually dependent upon the others, as from the evidence it is patently obvious the plaintiff, having the early opportunity to do so, did not take those precautionary steps which might have protected its claim of title in this case, and it should now be estopped to assert any claim of ownership to the disputed lands.

It might be argued that the facts set forth above in themselves are not enough to sustain the claim of equitable estoppel in this case, with the exception of

the one fact that the disputed lands were placed on the tax rolls in 1968 and such taxes were paid without protest by Roy Croft and defendants Hughes, who had no claim of ownership until 1972. That fact alone leaves little to doubt. Defendants' exhibit 5 contains the original copy of a letter dated August 16, 1968, from the county assessor of Scotts Bluff County, Nebraska, directed to the then owner, Roy Croft, which states in part as follows: "I have been directed by the Scotts Bluff County Board of Commissioners to add all accretion land, *used or occupied by you,* in Scotts Bluff County to the tax rolls for 1968." (Emphasis supplied.) This letter then goes on to delineate the exact description, which leaves no doubt that the plaintiff added the disputed real estate to Lots 1 and 2 "North" for tax purposes. This official action by the board of county commissioners of Scotts Bluff County can only be interpreted as a final acknowledgment in a long-standing matter that the ownership of the lands added was vested in Roy Croft, who was then using or occupying same, and by implication the defendants Hughes acquired the equitable title thereto under the agreement of sale dated November 30, 1970.

We have previously stated in the case of May v. City of Kearney, 145 Neb. 475, 17 N. W. 2d 448, as follows: " 'Equitable estoppels operate as effectually as technical estoppels. They cannot in the nature of things be subjected to fixed and settled rules of universal application, like legal estoppels, nor hampered by the narrow confines of a technical formula. So, while the attempted definitions of such an estoppel are numerous, few of them can be considered satisfactory, for the reason that an equitable estoppel rests largely on the facts and circumstances of the particular case, and consequently any attempted definition usually amounts to no more than a declaration of an estoppel under those facts and circumstances. * * * The following, however, may be ventured as the sum

of all cases: That a person is held to a representation made or a position assumed, where otherwise inequitable consequences would result to another who, having the right to do so under all the circumstances of the case, has, in good faith, relied thereon. Such an estoppel is founded on morality and justice, and especially concerns conscience and equity.' "

In the case of Pester v. American Family Mut. Ins. Co., 186 Neb. 793, 186 N. W. 2d 711, in an effort to further refine the position of this court with respect to equitable estoppel, we stated: "The essential elements of equitable estoppel are: As to party estopped, (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts; as to the other party, (4) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (5) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (6) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice."

Without going back through all the evidence presented in detail, let it suffice to say that the elements of estoppel are present in this matter. After an extended period of time, during which the defendants Hughes and their predecessors in title to Lots 1 and 2 "North" had, in connection therewith, occupied and used the disputed lands under claim of ownership, the plaintiff, acting through its official representative body, placed those disputed lands on the tax rolls, thereby creating the impression that there

was no dispute on its part regarding the ownership of same by defendants and their predecessors. The obvious intent of the plaintiff in this latter action was to induce the payment of additional taxes to plaintiff by the record owner of Lots 1 and 2 "North," the plaintiff then having full knowledge of all of the facts of this particular situation. Relying upon the position taken by the plaintiff, and having no knowledge of what its true position was, as manifested by the filing of this action, the defendants Hughes and their predecessors subsequently paid the taxes assessed in good faith, and did other material things with regard to the full use and enjoyment of the property. The actions taken subsequently by the plaintiff substantially changed the defendants Hughes' position to their injury, detriment, and prejudice.

Perhaps the only question that remains is whether or not the principle of equitable estoppel may be enforced against the plaintiff as a governmental entity. In the recent case of Warren v. Papillion School Dist. No. 27, 199 Neb. 410, 259 N. W. 2d 281, we made the following comments: "Although May v. City of Kearney * * * indicates that the doctrine of estoppel may be applied against governmental entities in compelling circumstances, the 'limitations upon the May case have been recognized in many subsequent cases. Ordinarily, the doctrine of equitable estoppel cannot be invoked against a municipal corporation. * * * Exceptions are made only where right and justice so demand. The doctrine is to be applied with caution and only in exceptional cases under circumstances clearly demanding its application to prevent manifest injustice.' Christian v. Geis, 193 Neb. 146, 225 N. W. 2d 868 (1975)."

Recognizing the necessity of limitation on the application of the doctrine of equitable estoppel in cases involving governmental entities, we nevertheless conclude that this case does not fall within the

limitations, that it is indeed an exceptional one in past history, attitude, and behavior of the parties, and that in the final analysis conscience dictates that justice itself can only be served and the rights of the defendants preserved by the imposition of the doctrine as against the plaintiff.

In a different vein, we would specifically note that the petition filed by the plaintiff in this case joins Dorothy Hughes and Marvin Hughes, wife and husband, together with Willis Young, as the named defendants, together with all other persons having or claiming an interest in the real estate in dispute. This petition was filed on February 20, 1976. The agreement between the defendants Hughes and Roy Croft, previously mentioned, was filed for record in the office of the register of deeds for Scotts Bluff County, Nebraska, on April 24, 1972, and was in fact plead in plaintiff's petition. An examination of that agreement and the real estate description set forth therein discloses that Roy Croft purported to sell the lands in dispute to the defendants Hughes. However, despite this fact and the knowledge that Roy Croft had previously asserted his ownership of the disputed lands, he was not joined as a party defendant in this proceeding nor was any service of summons had on him. The file does not disclose service of any other type in this case, and by virtue of the provisions of section 25-21,113, R. R. S. 1943, a serious question arises as to whether or not the judgment of the trial court entered October 26, 1977, purporting among other things to foreclose his interests in the disputed lands, would be binding upon him. One wonders what the position of the plaintiff might be if the defendants Hughes, who possess an equitable title only, were now to default, and Roy Croft were to reenter into possession of Lots 1 and 2 "North." Could he then resell Lots 1 and 2 "North" under the same description as used previously and, if so, would the plaintiff then have to commence another

proceeding to enforce their disputed claim? This is noted only for the record, since no issue in this regard was specifically raised on appeal, and it becomes moot in view of the finding of this court.

The judgment of the trial court is reversed and the cause remanded for entry of a decree in accord with the findings set forth herein.

REVERSED AND REMANDED WITH DIRECTIONS.

KRIVOSHA, C. J. concurs in result.