JUDY AND PATRICK OSMERA ET AL., APPELLANTS, V. THE SCHOOL DISTRICT OF SEWARD, IN THE COUNTY OF SEWARD, IN THE STATE OF NEBRASKA, ET AL., APPELLEES.
343 N.W.2d 886

Filed January 27, 1984.  No. 82-726.

John F. Recknor of Barlow, Johnson, DeMars & Flodman, for appellants.

Blevens, Blevens & Jacobs, for appellees.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

Judy and Patrick Osmera commenced an action in

the district court for Seward County seeking an injunction to prevent the School District of Seward and its board of education (Seward) from closing the Ulysses attendance center until a majority of the patrons of the former Ulysses school district either petitioned or voted to close the attendance center. (Reference to "Osmeras" includes all plaintiffs voters of the Ulysses school district who have joined in the lawsuit.) Finding that the Osmeras failed to prove the elements of equitable estoppel, the district court denied the injunction. We affirm.

Before the 1958-59 school year, Seward decided not to accept nonresident high school tuition students. Thereafter, Seward and the Class I school districts undertook a plan for reorganization of the districts. On December 17, 1958, the Ulysses school board (Ulysses) and Seward undertook negotiations for possible merger of the two districts. Ulysses was a Class II school district maintaining a high school.

In March 1959 the voters of the Class I districts defeated the plan for reorganization of Seward and the Class I districts. Seward reaffirmed its refusal regarding nonresident high school tuition students. To counter that refusal by Seward, citizens of the rural areas considered building a rural high school, but this alternative proved unattractive. The Class I districts began negotiations with Seward so that their students might attend school in Seward. On June 6, 1959, there emerged from those negotiations a document entitled "Cooperative Reorganization Commitments" involving Seward and the Class I districts. Ulysses never participated in the negotiations or "Cooperative Reorganization Commitments" achieved by the Seward and the Class I districts.

The Cooperative Reorganization Commitments included specific and express provisions, namely: "Each presently existing Class I School District will be designated as a Ward School and supervised by a Ward School Committee of three members who are

patrons of that district. No Ward School will be closed, except after a vote or petition by a majority of the school patrons in the area that formerly comprised that school district" (Commitment No. 2), and "Class I school districts signing and filing such petitions may, if they wish, place therein a condition that the same shall not be acted upon until the total assessed valuation of the Seward School District shall equal the sum of Fourteen Million Dollars" (Commitment No. 5).

After adoption of the Cooperative Reorganization Commitments, petitions were circulated in the Class I districts for the creation of a new school district to include the Class I districts and Seward. The petitions were approved by the county reorganization committee and the state reorganization committee. During the 10-day period after the county hearing on the petitions for reorganization, pursuant to Neb. Rev. Stat. § 79-402 (Cum. Supp. 1957), some signatories withdrew their names from the petitions. As a consequence of such withdrawals, the petitions lacked 55 percent of the voters as required by § 79-402 (Cum. Supp. 1957), and the total valuation of the proposed district fell below the $14 million specified by Commitment No. 5 of the Cooperative Reorganization Commitments.

Around the time that the reorganization involving the Class I districts and Seward failed because the valuation of the proposed district fell below $14 million, the patrons of Ulysses took a straw vote which indicated a preference to consolidate Ulysses with Seward rather than the Butler County schools. On December 10, 1959, both Ulysses and Seward filed their respective petitions for Ulysses' annexation to Seward. See § 79-402 (Cum. Supp. 1957). Neither Ulysses' nor Seward's petition refers to the Cooperative Reorganization Commitments of June 6, 1959. Further, neither petition contained any other condition or exception. On December 11, 1959 (the date on which Ulysses and Seward filed their respective

petitions), another rural school district petitioned for annexation to Seward. The total, combined effect of all petitions—that by Ulysses and those of the Class I districts which had adopted the Cooperative Reorganization Commitments—was a proposed district having an aggregate valuation in excess of $14 million. Without Ulysses, valuation of the proposed district would not have equaled $14 million as required by Commitment No. 5 of the Cooperative Reorganization Commitments. Pursuant to the petitions of the various districts, including Ulysses, and with approval of the appropriate reorganization committees, Seward's reorganization became effective on February 24, 1960.

After February 24, 1960, and as provided by the Cooperative Reorganization Commitments, one-room schoolhouses of the former Class I districts were closed. Additionally, and sometime after February 24, 1960, the Ulysses high school was closed. The reorganized district (Seward) operated schools having kindergarten through eighth grade in Goehner, Staplehurst, Ulysses, and Seward, as well as operating a high school in Seward. In 1980 kindergarten students of the Ulysses attendance center were transported to Staplehurst.

As requested by Seward, the State Department of Education and the University of Nebraska-Lincoln made a survey of Seward. The survey reported considerable problems with the physical plant of the Ulysses attendance center, including sagging in the floors, water damage, a badly deteriorated roof overhang, and that the large window areas were not conducive to energy conservation. The report noted, "Any attempt to remedy these problems would undoubtedly be more expensive than what could be justified for a building of this age and type of construction. However, if the district continues to use this facility, school officials should have these conditions inspected and monitored by personnel capable of determining the structural condition and

safety of the building." The survey recommended that "[c]onsideration should be given to closing the Ulysses attendance center as soon as school officials deem it practical." After various meetings with voters of Ulysses and patrons of the Ulysses attendance center, Seward, in February 1982, decided to close the Ulysses attendance center at the end of the 1981-82 school year.

When the Ulysses attendance center was closed, Osmeras, as Ulysses voters, sued to enjoin the closing by Seward. The theory advanced by Osmeras was equitable estoppel, that is, Seward's closing the Ulysses attendance center without a vote or petition of a majority of Ulysses patrons was contrary to Commitment No. 2 of the Cooperative Reorganization Commitments.

The trial court found that Osmeras had failed to establish the elements of equitable estoppel, and refused to enjoin Seward's closing the Ulysses attendance center.

Osmeras contend the district court erred in rejecting equitable estoppel as a basis for the requested injunction.

The doctrine of equitable estoppel is based on grounds of public policy and good faith, and is interposed to prevent injustice and inequitable consequences. *Koop v. City of Omaha*, 173 Neb. 633, 114 N.W.2d 380 (1962). " '[Equitable estoppel] is interposed to prevent injury, fraud, injustice, and inequitable consequences by denying to a person the right to repudiate his acts, admissions, or representations, when they have been relied on by persons to whom they were directed and whose conduct they were intended to and did influence.' " *City of Grand Island v. Willis*, 142 Neb. 686, 697, 7 N.W.2d 457, 463 (1943) (citing 31 C.J.S. *Estoppel* § 63 (1942)).

"Ordinarily, the doctrine of equitable estoppel cannot be invoked against a municipal corporation. . . . Exceptions are made only where right and justice so demand. The doctrine is to be applied

with caution and only in exceptional cases under circumstances clearly demanding its application to prevent manifest injustice." *Christian v. Geis*, 193 Neb. 146, 149, 225 N.W.2d 868, 870 (1975). See *Warren v. Papillion School Dist. No. 27*, 199 Neb. 410, 259 N.W.2d 281 (1977).

"The essential elements of equitable estoppel are: As to the party estopped, '* * * (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts.' As to the other party, '* * * (4) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (5) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (6) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice.' " *Pester v. American Family Mut. Ins. Co.*, 186 Neb. 793, 798-99, 186 N.W.2d 711, 714 (1971). See *County of Scotts Bluff v. Hughes*, 202 Neb. 551, 276 N.W.2d 206 (1979).

Among some of the elements of equitable estoppel to be proved, Osmeras must show conduct by Seward which was (a) false representation or concealment of a material fact pertinent to the Ulysses annexation to Seward; or (b) calculated to convey the impression that Ulysses was within the purview of the Cooperative Reorganization Commitments, namely, that the patrons of Ulysses would be entitled to vote on or petition for closing the Ulysses attendance center—a position inconsistent with Seward's present stance that Ulysses was not involved in such commitments; and (c) Ulysses' change of position as a consequence of its reliance upon Seward's con-

duct.  See, *Christian v. Geis, supra*; *Tighe v. Security Nat. Life Ins. Co.*, 191 Neb. 271, 214 N.W.2d 622 (1974).

Although the distinct merger movements may have been relatively contemporaneous, there is no evidence that such movements were unified, orchestrated, or interdependent.  Ulysses negotiated for merger with Seward in 1958, before the Cooperative Reorganization Commitments were adopted by Seward and the Class I districts in June 1959.  We note that the Cooperative Reorganization Commitments relate to Seward and Class I districts with no mention of involvement of any Class II school district such as Ulysses.  The petitions by Ulysses and Seward in December 1959 are silent regarding the Cooperative Reorganization Commitments which Ulysses claims as a basis for an injunction.  Further, nothing indicates that Ulysses' petition was submitted in reliance upon the Cooperative Reorganization Commitments or any conduct of Seward. In summary, the evidence does not show any conduct on the part of Seward in the form of a false representation or concealment of a material fact upon which Ulysses relied in the Ulysses-Seward merger. Because conduct and reliance as elements of equitable estoppel are absent in the present case, we do not have to discuss the other elements required for application of the doctrine of equitable estoppel. The district court was correct in concluding that the doctrine of equitable estoppel was not applicable in the present case.

Osmeras also claim that school in Ulysses must continue after reorganization until "the legal voters served by the school vote by a majority for the discontinuance of the school."  Brief for Appellants at 23.  See Neb. Rev. Stat. § 79-426.11 (Reissue 1981). This particular part of § 79-426.11 became effective on October 19, 1963.  The previous statute, § 79-426.11 (Reissue 1950), contained no such permissive provision for continuation of school until termination by a

majority vote of a school district's legal voters. Also, the reorganization contemplated by § 79-426.11 (Cum. Supp. 1963) is accomplished by an election resulting in the legal voters' approving a plan of reorganization. See Neb. Rev. Stat. § 79-426.13 (Cum. Supp. 1963 and Reissue 1981). The reorganization under examination in the present litigation was achieved by a petition of the Ulysses board of education and not by an election approving a plan of reorganization for Ulysses. See § 79-402 (Cum. Supp. 1957). Because the reorganization occurred pursuant to § 79-402 upon petition by the board of education of the Ulysses school district, the provision for continuation of school found in § 79-426.11 until termination of school by the legal voters is not germane to or controlling in the present case.

The final contention by Osmeras is that Seward acted unreasonably and arbitrarily in closing the Ulysses attendance center. Seward possessed a survey made by the State Department of Education and the University of Nebraska-Lincoln. The survey indicated unsatisfactory conditions regarding the physical plant of the Ulysses attendance center. Also, according to the survey, teachers of Ulysses had to teach a greater number of grade levels than were being taught by teachers in similar schools elsewhere in the Seward district. The action by Seward was not taken in disregard of facts or circumstances, and did have some basis which would lead a reasonable and honest person to the same conclusion reached by Seward concerning closing the Ulysses attendance center. Cf. *In re Appeal of Levos*, 214 Neb. 507, 335 N.W.2d 262 (1983). In view of the record presented we conclude that the actions of Seward were not unreasonable and arbitrary.

For the reasons given the judgment of the district court is affirmed.

AFFIRMED.