THOMAS F. CAVANAUGH, APPELLEE, V. ALIETTE BERTHILE MARTIN DEBAUDINIERE, ALSO KNOWN AS ALIETTE BERTHILE CAVANAUGH, APPELLANT.

493 N.W.2d 197

Filed June 23, 1992.   No. A-91-1117.

Donald A. Roberts, of Lustgarten & Roberts, P.C., for appellant.

J. Joseph McQuillan and Betty L. Egan, of Walentine, O'Toole, McQuillan & Gordon, for appellee.

SIEVERS, Chief Judge, and HANNON and WRIGHT, Judges.

WRIGHT, Judge.

This is an appeal from the order of the district court for Douglas County which dissolved the marriage of Aliette Berthile Martin deBaudiniere and Thomas F. Cavanaugh and awarded custody of Bertilla (Tia) B. Cavanaugh to Thomas, subject to Aliette's rights of visitation. The genetic test results offered by Aliette established that Thomas was not the biological father of Tia. The court found that Aliette was estopped from offering the results of the test.

Aliette appeals the award of custody to Thomas and assigns as error the court's excluding the genetic test results and the court's awarding custody of Tia to the nonbiological party, Thomas.

## STANDARD OF REVIEW

In an appeal involving an action for dissolution of marriage, an appellate court's review of a trial court's judgment is de novo on the record to determine whether there has been an abuse of discretion by the trial judge, whose judgment will be upheld in the absence of such an abuse. *Stuhr v. Stuhr*, 240 Neb. 239, 481 N.W.2d 212 (1992). In such de novo review, an appellate court is required to reach independent conclusions on the issues presented by appeal without reference to the conclusions or judgment of the district court. *Keim v. Keim*, 228 Neb. 684, 424 N.W.2d 112 (1988).

Regarding a question of law, an appellate court has an obligation to reach a conclusion independent of that of the trial court in a judgment under review. *City of Newman Grove v. Primrose*, 240 Neb. 70, 480 N.W.2d 408 (1992); *Baker v. St. Paul Fire & Marine Ins. Co.*, 240 Neb. 14, 480 N.W.2d 192 (1992).

## FACTS

Aliette was born in St. Malo, France, in 1955 and is a French citizen. She graduated from the "Letters Program" at the University of Haute Bretagne in Rennes, France, and in 1986 acquired a research scholarship from the Japanese government to study at the Tokyo University of Fine Arts and Music. She received a "Diploma of Japanese Language" in 1987 from the Osaka University of Foreign Studies. She speaks English, French, Japanese, and Spanish. She has shown her art in one-person exhibitions, group exhibitions, and mural realizations since 1983.

Thomas, born February 8, 1952, has lived in the Omaha area since his birth. His two brothers, three sisters, and mother all live in Omaha, and he has considerable contact with his extended family. He first met Aliette in 1973, when he was asked to take her to a farm in Ewing, Nebraska, where he worked. The farm was owned by Aliette's second cousin. After this visit, Aliette returned to France. When she returned to Omaha in 1975, Thomas fell in love with her. When Aliette went to visit friends on the east coast, Thomas quit his job to join her for the remainder of her stay in the United States and proposed

marriage to her. She was 19, and he was 23. That relationship and the proposals of marriage continued until 1986.

In the spring of 1988, the parties had several long telephone conversations about Aliette coming to the United States, so they could get married, settle down, and have a family. They met in San Francisco, California, on July 26, 1988, and spent several days together. During Aliette's visit to the United States, Thomas proposed marriage and she accepted, although a date was not set for the marriage. They discussed a spring wedding in Ewing. During this visit, the parties were intimate and engaged in sexual intercourse on a number of occasions, including July 26.

In September 1988, Aliette returned to Tokyo and discovered she was pregnant. She called Thomas and told him of her pregnancy. She was sure that Thomas was the child's father. Thomas testified that he assumed it was his child. Thomas told Aliette that immediately after the November election he would go to Tokyo, and they would see if they could get married. Aliette wanted to have her relatives come to Nebraska for a spring wedding after the baby was born. The couple finally decided that they would be married in Tokyo.

Before Aliette and Thomas met in San Francisco in July, she had had an affair with a Terry Jaicomino. She had been intimate with Jaicomino on July 15, 1988, but had terminated her relationship with him.

The marriage took place in Japan on December 23, 1988, and a subsequent ceremony was held in France. Although Aliette wanted to give birth to the child in France, she agreed to have the child born in the United States to please Thomas. Tia was born March 30, 1989. Thomas was listed as the father on the birth certificate. Aliette took care of Tia from the time of her birth, including breast-feeding and staying home with the child while Thomas worked.

From the time of the marriage, the parties lived in Thomas' mother's house. Tia, Marie Caroline (Aliette's niece who acted as a nanny), and Thomas stayed at his mother's house while Aliette continued her studies in Japan. She kept in contact with Marie Caroline by phone once or twice a week to discuss Tia's progress, answer questions, and discuss meals. When Aliette

returned to the United States on December 16, 1989, she realized from her experience as an artist who had painted portraits that the shape of Tia's face and her eyes, nose, and mouth resembled Jaicomino's. In December, Aliette told Thomas that Tia was probably not his child. He did not question Aliette about the statement, and when she returned to Japan in the middle of January 1990 for 1 month to finish her schooling, Thomas wrote to her and thanked her for being truthful with him. On February 9, 1990, Aliette returned home from Japan after completing her master's degree. She testified that upon her return, Thomas' conduct had changed and he had become mean, strange, and violent.

Aliette once again became the full-time care provider for Tia. In the summer of 1990, Aliette and Tia went to France. Aliette continued to take care of Tia, participating in activities with her and teaching her to speak French. Upon Aliette and Tia's return to Nebraska in the fall of 1990, the parties became more estranged.

Aliette and Tia again went to France for 1 month in February 1991. While she was there, Aliette visited with a teacher who proposed that Aliette take an exam in order to qualify for a grant to study in Madrid, Spain, which grant would allow the parties to move to Europe, as they had discussed earlier. Aliette made plans to take the test in May 1991.

Prior to Aliette's going to France in February, Thomas and Aliette had seen a counselor, at which time they had again discussed the fact that Thomas was not Tia's father. Approximately 2 weeks before Aliette and Tia were to go to Madrid, the parties had an argument. Thomas told Aliette that she could not take Tia to France, and she again told Thomas that he was not Tia's father. As a result of that argument, Thomas canceled Tia's airline tickets, closed the parties' joint bank account, and took Aliette and Tia to live at his mother's house. Aliette did not take Tia to Madrid when she took her test.

When Aliette returned from Madrid, she discovered that Thomas had filed a petition for legal separation and temporary custody and had secreted Tia. He told Aliette that she could see Tia, but not stay with her. On June 14, 1991, the district court

awarded temporary custody to Thomas, and he has maintained possession and custody of Tia since that time.

## THE BLOOD TEST

The dispositive issue of this case is whether the trial court correctly excluded exhibit 12, the blood test, which showed that Thomas was not the biological father of Tia. At trial, Aliette offered the report of the genetic testing requested by Aliette and ordered by the court. The genetic testing was considered incompetent and irrelevant because the court found that Aliette had either waived the right to deny that Thomas was Tia's father or was equitably estopped from denying that Thomas was Tia's father. The court found that Aliette could not deny Thomas was Tia's father because Aliette had knowledge that Tia was a full-term baby as of March 1989. The court concluded that Aliette knew at Tia's birth that Thomas could not be the biological father and that Aliette would have had either actual or constructive knowledge at a much earlier time.

The court did not attribute bad faith to Aliette, but found that there was concealment from Thomas with the obvious expectation that he would rely on the facts as presented by Aliette, that is, accept Tia as his biological offspring. The court found that all of the elements of equitable estoppel had been met and that the exclusion of the blood test was justified.

Normally, the admissibility of evidence is controlled by the Nebraska rules of evidence. *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992). However, in this instance, judicial discretion is a factor in the admissibility, since the court ruled that the evidence was not admissible because of waiver or equitable estoppel.

Neb. Rev. Stat. § 42-377 (Reissue 1988) states:

> Children born to the parties, or to the wife, in a marriage relationship which may be dissolved or annulled pursuant to sections 42-347 to 42-379, shall be legitimate unless otherwise decreed by the court, and in every case the legitimacy of all children conceived before the commencement of the suit shall be presumed until the contrary is shown.

Section 42-377 does not create an irrebuttable presumption of

legitimacy in the case of children conceived before the commencement of the suit. However, presumed legitimacy of children born in wedlock may not be rebutted by the testimony or declaration of a parent. *Ford v. Ford*, 191 Neb. 548, 216 N.W.2d 176 (1974). The blood tests, if admitted, would rebut the presumption that Thomas was the biological father of Tia.

A similar requirement for paternity cases is stated in Neb. Rev. Stat. § 43-1412 (Reissue 1988):

> The uncorroborated testimony (a) of the mother, in a proceeding instituted by the mother or the guardian or next friend, or (b) of the alleged father, in a proceeding instituted by the alleged father, shall not alone be sufficient to support a verdict or finding that the alleged father is actually the father.

Thus, the admission of the blood test (exhibit 12) would determine the status of Thomas' relationship to Tia. From a legal standpoint, Thomas is either her father or her ex-stepfather, but he is not her biological father. Section 42-377 provides that the issue of the legitimacy of children conceived before a dissolution action was commenced is a rebuttable presumption. The statute contemplates that evidence may be used to rebut the presumption. Regarding paternity cases, Neb. Rev. Stat. § 43-1415 (Reissue 1988) states: "The results of the tests, including the statistical probability of paternity, shall be admissible evidence and shall be weighed along with other evidence of paternity. . . ."

## ESTOPPEL

The trial court sustained Thomas' objection to the genetic testing report because Aliette had either waived her right to deny Thomas' paternity or was equitably estopped from denying his paternity. To sustain the denial of the admission of the report of nonpaternity on the grounds of equitable estoppel, six essential elements of estoppel must be established by the party asserting the doctrine. *Perry v. Esch*, 240 Neb. 289, 481 N.W.2d 431 (1992); *State on behalf of J.R. v. Mendoza*, 240 Neb. 149, 481 N.W.2d 165 (1992); *State v. Nebraska Assn. of Pub. Employees*, 239 Neb. 653, 477 N.W.2d 577 (1991); *Wheat Belt Pub. Power Dist. v. Batterman*, 234 Neb. 589, 452 N.W.2d

49 (1990); *Commerce Sav. Scottsbluff v. F.H. Schafer Elev.*, 231 Neb. 288, 436 N.W.2d 151 (1989); *Circle 76 Fertilizer v. Nelsen*, 219 Neb. 661, 365 N.W.2d 460 (1985); *Osmera v. School Dist. of Seward*, 216 Neb. 261, 343 N.W.2d 886 (1984).

In order to constitute equitable estoppel, there must be, as to the party estopped,

> "(1) conduct which amounts to a false representation or concealment of material facts or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts; as to the other party, (4) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (5) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (6) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice."

*State on behalf of J.R. v. Mendoza*, 240 Neb. at 164, 481 N.W.2d at 175.

To successfully assert that Aliette is estopped from denying his paternity of Tia, Thomas must prove by clear and convincing evidence that Aliette engaged in conduct which amounted to a false representation or concealment that Thomas was not the father, or, at least, which was calculated to give Thomas the impression he was the father of Tia when Aliette knew that someone else was in fact Tia's father. See *Circle 76 Fertilizer v. Nelsen, supra.*

Aliette had sexual relations with Jaicomino on July 15, 1988. She had sexual relations with Thomas on July 26, 1988. The child was born March 30, 1989, and was a full-term baby. The record shows that when Aliette informed Thomas she was pregnant, he assumed the child was his and that Aliette believed the child was his.

In reviewing the record de novo, we find no evidence that Aliette knew prior to the child's birth that Thomas was not the

father. She had sexual relations with two different men only 11 days apart. There was no evidence of the dates of Aliette's July 1988 menstrual cycle.

The definition of conception in Taber's Cyclopedic Medical Dictionary 368 (15th ed. 1985) contains the following:

> With a cycle of 28 days, menstruation normally lasts five days followed by a period of repair and proliferation of the lining of the uterus (endometrium) for about a week. Until ovulation occurs, the female is sterile. In general, ovulation occurs about 12 to 14 days prior to the beginning of the next menstrual period. Thus sexual intercourse during the middle of the menstrual cycle is most likely to result in conception. During this period, the ovum is discharged from the follicle and makes its way through the fallopian tube to the uterus. If fertilization does not occur during this time, the ovum disintegrates and for the remaining portion of the menstrual cycle (the 10 days preceding menstruation) conception is less likely to occur.
>
> However, one of the most variable events known in human biology is the menstrual cycle. It is therefore quite difficult, and in many cases impossible, to predict optimum time of conception or the reverse by attempting to calculate ovulation time from the time the last menstrual period occurred.

The evidence does not show that Aliette knew the date of her last menstrual period prior to discovering that she was pregnant. Therefore, she could not predict the time of conception by attempting to calculate ovulation from the time the last menstrual period occurred. "[S]exual intercourse during the middle of the menstrual cycle is most likely to result in conception." *Id*. If the middle of Aliette's menstrual cycle was July 20, 1988, conception was equally likely on July 15 or July 26.

Aliette testified that when she discovered she was pregnant, she was sure that Thomas was the father. She called Thomas to share her joy. Such a statement would be a false representation only if Aliette knew at the time she discovered she was pregnant that Thomas was not the father of Tia. When the child was

born, Aliette still believed that Thomas was the father. Although the district court concluded that Aliette knew Thomas was not the biological father because the baby was full term, there was no evidence to support that conclusion. Aliette would not know the baby was full term until the baby was born, and she could not predict the optimum time of conception by attempting to calculate ovulation from the time her last menstrual period occurred. Aliette testified she did not know the date of her menstrual period in question.

In order to establish the first element of equitable estoppel, the evidence must show clearly and convincingly that Aliette falsely represented that Thomas was the father of Tia. It does not. Each element of equitable estoppel must be proven by clear and convincing evidence. *Commerce Sav. Scottsbluff v. F.H. Schafer Elev., supra*; *Circle 76 Fertilizer v. Nelsen, supra*.

Thomas testified that between 1975 and 1988, he had had sexual relationships with women other than Aliette and that he had no reason to believe that during the same time, Aliette had not had sexual relationships with men other than himself. The parties had no agreement that they would be "celibate." The child was born 8 months 4 days after Thomas and Aliette had had sexual relations and 8 months 15 days after she had had sexual relations with a different man.

The second element of equitable estoppel Thomas must establish is that Aliette intended for Thomas to marry her as a result of her representations that he was the father of Tia or that Aliette intended that Thomas accept Tia as his own child. The parties had discussed marriage for 13 years. Thomas had proposed to Aliette as early as 1975 and as recently as the spring of 1988. After they had had sexual relations in July 1988, they spoke of marriage, but set no date. No evidence showed that Aliette intended for Thomas to marry her simply because she was pregnant. The evidence did show that Thomas had been asking Aliette to marry him since 1975.

Thomas' actions in treating Tia as his own did not change when he was told he was not the father of the child. The parties' relationship may have deteriorated when Thomas was told in December 1989 that he might not be the father of Tia, but if anything, Thomas' activities as the father of Tia intensified.

The second element of equitable estoppel has not been proven.

The third element of equitable estoppel Thomas must establish is that Aliette had knowledge, actual or constructive, of the real facts, that is, that Thomas was not the father of Tia. Because the baby was full term, Aliette could not have known the identity of the father without obtaining a blood test. As soon as Aliette believed that Thomas was not the father, she confided in him. He wrote her a letter and thanked her for being truthful. During counseling, Thomas and Aliette discussed the fact that Thomas was not the father.

Thomas was advised he was not the father of Tia before any action was commenced by him for separation or dissolution of the marriage. Thomas was first told in December 1989 that Tia was probably not his child, and Thomas did not question that statement. From December 1989 until the parties' separation in June 1991, Thomas knew he might not be Tia's father, but he continued to act as her father.

From our review of the record, none of the first three essential elements of estoppel have been established by clear and convincing evidence.

We find that Aliette did not waive her right to deny Thomas' paternity. Waiver is defined as a voluntary and intentional relinquishment or abandonment of a known existing legal right or such conduct as warrants an inference of the relinquishment of such right. *Wheat Belt Pub. Power Dist. v. Batterman, supra*; *Jelsma v. Scottsdale Ins. Co.*, 231 Neb. 657, 437 N.W.2d 778 (1989). No evidence indicates that Aliette voluntarily and intentionally relinquished or abandoned her right to contest the fact that Thomas was Tia's father. Aliette did not make a clear unequivocal decision to relinquish her right to determine whether Thomas was the biological father of Tia. Since December 1989, she had asserted that Thomas was not the father.

## ESTOPPEL IN OTHER JURISDICTIONS

The cases cited by Thomas are distinguishable. In *Hill v. Hill*, 20 A.D.2d 923, 249 N.Y.S.2d 751 (1964), the court refused to grant the wife's motion for a blood grouping test because the wife, during the period of conception and birth of the child and

for 6 years thereafter, concealed from the husband the adultery to which she later confessed solely to secure the child's custody. In the case at bar, as soon as Aliette suspected that Thomas was not the father, she told him.

In *Miller v. Anderson*, 43 Ohio 473, 3 N.E. 605 (1885), *overruled by Johnson v. Adams*, 18 Ohio St. 3d 48, 479 N.E.2d 866 (1985), a man who was not the father of an unborn child elected to stand in loco parentis, knowing that the woman he was marrying was pregnant and that, at law, he would be regarded as adopting the child into his family at its birth. The court held that the husband, although not the alleged biological father, was liable for the support of the child. The man knew before the marriage that he was not the child's father, which distinguishes the case from the case at bar.

In *Atkinson v Atkinson*, 160 Mich. App. 601, 408 N.W.2d 516 (1987), the court held that the wife was entitled to offer evidence that the husband was not the biological father, despite the presumption of legitimacy which attaches to children born during marriage. The doctrine of equitable estoppel did not work to prevent the court from ordering the husband to submit to a blood test and admitting the test results. Originally, Michigan had followed Lord Mansfield's Rule, which prohibited testimony by either spouse that a child born during the marriage was illegitimate. *Serafin v Serafin*, 401 Mich. 629, 258 N.W.2d 461 (1977). Earlier cases which applied the doctrine of estoppel were used to deny the right of the husband, who had held himself out to be the father, to subsequently deny paternity in a dissolution proceeding. *Johnson v Johnson*, 93 Mich. App. 415, 286 N.W.2d 886 (1979). *Atkinson v Atkinson, supra*, held that equitable estoppel did not apply because the mother's claim that the husband was not the biological father was made early in the proceeding. The court, however, found that the husband could be entitled to be treated as the natural parent under the "equitable parent" doctrine.

In re Marriage of *D.L.J.*, 162 Wis. 2d 420, 469 N.W.2d 877 (Wis. App. 1991), recognized the "equitable parent" theory where the husband and wife lived together during at least part of the wife's pregnancy and the husband attended birthing classes; fed, changed, and bathed the child; and took care of her

in any way she needed. The wife did not assert that the husband was not the child's father until after he had filed for custody. He alleged that he was concerned for the child's safety because of the wife's drinking. In the case at bar, Thomas had known as early as 18 months before commencing an action for temporary custody that he might not be the biological father. The court, in *In re Marriage of D.L.J.*, stated that whether the trial court may apply the doctrine of equitable estoppel is a question of law which it decides without deference to the trial court, citing *Marriage of A.J.N. & J.M.N.*, 141 Wis. 2d 99, 414 N.W.2d 68 (Wis. App. 1987).

The timing in raising the question of paternity was the issue in a number of other cases. In *Mtr Boyles v Boyles*, 95 A.D.2d 95, 466 N.Y.S.2d 762 (1983), the wife did not contend that the husband was not the father until the custody proceeding was commenced and the child was nearly 4 years old. In *Mtr Sharon GG. v Duane HH.*, 95 A.D.2d 466, 467 N.Y.S.2d 941 (1983), it was only after the wife was thwarted in her attempt to deny the husband visitation that she expressed any question concerning paternity. In *Commonwealth ex rel. Gonzalez v. Andreas*, 245 Pa. Super. 307, 369 A.2d 416 (1976), it was only after the parties separated that the husband questioned paternity. In *Hodge and Hodge*, 84 Or. App. 62, 733 P.2d 458 (1987), the wife never made an issue of paternity until the husband filed for dissolution when the child was 3 years old. In *Johns and Johns*, 42 Or. App. 39, 599 P.2d 1230 (1979), the wife made misrepresentations to the husband and twice stated in documents before the court that the child was a child of the marriage. None of these cases are factually similar to the case at bar because the wives did not raise the issue of paternity until after custody proceedings had been commenced. Aliette informed Thomas as soon as she realized he might not be Tia's father, which was 18 months before an action for dissolution and custody was commenced by Thomas.

In the present case, we find that the doctrine of equitable estoppel does not apply because none of the first three essential elements have been shown by clear and convincing evidence. The trial court abused its discretion in not allowing the results of the blood test, which showed that Thomas was not the father

of Tia. We find that the blood test should have been admitted and that Thomas F. Cavanaugh is not the biological father of Bertilla B. Cavanaugh.

## CHILD CUSTODY

Having made this determination, we now address the issue of custody of Tia. The Nebraska Supreme Court, in *Stuhr v. Stuhr*, 240 Neb. 239, 481 N.W.2d 212 (1992), held that in the absence of a statutory provision otherwise, in a child custody controversy, a fit biological or adoptive parent has a superior right to custody of the child. The right of a biological parent to custody of the minor child is not lightly to be set aside in favor of more distant relatives or unrelated parties, and the courts may not deprive a parent of such custody unless the biological parent is shown to be unfit or to have forfeited his or her superior right to such custody. *Id.*

In *Stuhr*, the court noted that 38 states have adopted the "parental preference principle," in which parental custody is denied to the biological parent only when such custody would be detrimental to the child's welfare. This principle is reflected in *Nielsen v. Nielsen*, 207 Neb. 141, 296 N.W.2d 483 (1980), and *Peterson v. Peterson*, 224 Neb. 557, 399 N.W.2d 792 (1987), and is in recognition that "the relationship between parent and child is constitutionally protected." See *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978). The *Stuhr* court held:

> Accordingly, a court may not, in derogation of the superior right of a biological or adoptive parent, grant child custody to one who is not a biological or adoptive parent unless the biological or adoptive parent is unfit to have child custody or has legally lost the parental superior right in a child.

240 Neb. at 246, 481 N.W.2d at 217.

In appeals concerning dissolution of marriage and custody of minor children, an appellate court is required to try the case de novo on the record and reach independent conclusions on the issues presented by appeal without reference to the conclusion or judgment of the district court. *Keim v. Keim*, 228 Neb. 684, 424 N.W.2d 112 (1988). Having reviewed the record,

we agree with the district court's finding that both parties are fit and proper persons to have custody of Tia. However, in applying the rule in *Stuhr*, we find that Aliette, as the biological parent, has the superior right to custody of Tia and that the district court erred by not recognizing Aliette's superior right to custody of the minor child. We therefore reverse the district court's judgment and grant custody of the minor child, Bertilla B. Cavanaugh, born March 30, 1989, to Aliette Berthile Martin deBaudiniere.

## IN LOCO PARENTIS

The next issue to be addressed is whether Thomas has any rights with regard to Tia. Since he is not the biological father, his divorce makes him the ex-stepfather of Tia, and he would not have any rights unless the doctrine of in loco parentis applied to his situation.

In *Hickenbottom v. Hickenbottom*, 239 Neb. 579, 477 N.W.2d 8 (1991), the Supreme Court was asked to determine whether the district court had jurisdiction to grant the husband, as the ex-stepparent, the right to *visit* his former stepdaughter. Custody was not involved. The court stated that in the handful of jurisdictions that have examined the same issue, most have concluded that an ex-stepparent is entitled to visitation of a former stepchild, based upon the doctrine of in loco parentis, where the stepparent and a young child have lived in a home environment and developed deep and lasting bonds of mutual affection. The courts have acknowledged the fact that a stepparent may be the only parent the child has truly known and loved during its minority. Therefore, rejection of visitation privileges cannot be based upon the mere fact that the person is not the biological parent, but is the stepparent. Thus, when the parties have developed a bond and the status of in loco parentis, the courts have protected the relationship by conferring rights of visitation. Aliette has not denied that Thomas should be allowed visitation of Tia.

As we review the record, we find that Thomas has continued to assume his role as a father to Tia and that he has the status of in loco parentis. A child with a stepparent who has assumed the role and duty of a parent is, in fact, a child of the marriage

under which the court may award visitation. *Hickenbottom, supra*. The best interests of the child may require visitation with the ex-stepparent in order to continue a relationship with persons who have been a part of the family.

The court, in *Farmer v. Farmer*, 200 Neb. 308, 310, 263 N.W.2d 664, 666 (1978), quoted Neb. Rev. Stat. § 42-351 (1943), which provided: " 'In proceedings under sections 42-347 to 42-379, the court shall have jurisdiction to inquire into such matters, make such investigations, and render such judgments and make such orders, both temporary and final, as are appropriate concerning the status of the marriage, the custody and support of minor children . . . .' " The court concluded that under Nebraska law, district courts have complete jurisdiction over custody, support, and welfare of all minor children who are touched by divorce proceedings and all related issues and that the district court had jurisdiction to award the stepfather rights of visitation with his former stepdaughter. Based on these cases, our review of the record in the case at bar, and the findings of the trial court, we find that Thomas is entitled to visitation under the doctrine of in loco parentis.

We reverse the judgment of the district court and grant custody of Tia to Aliette, and we remand the cause to the district court and direct it to make a determination as to whether Thomas desires to continue his status of in loco parentis to Tia by exercising his rights of visitation. Should Thomas desire to continue such status, the district court shall fix his rights of visitation and determine the amount of child support payable by Thomas for the support of Tia. *Hickenbottom v. Hickenbottom, supra*; *State on behalf of J.R. v. Mendoza*, 240 Neb. 149, 481 N.W.2d 165 (1992).

REVERSED AND REMANDED WITH DIRECTIONS.