IN RE APPLICATIONS OF NEBRASKA PUBLIC POWER
DISTRICT.
NEBRASKA PUBLIC POWER DISTRICT, APPELLEE, V.
NEBRASKA SAFE ENERGY ALTERNATIVES, INC., ET AL.,
APPELLANTS,
NEBRASKA ELECTRIC GENERATION AND TRANSMISSION
COOPERATIVE, INC., INTERVENOR-APPELLEE.

337 N.W.2d 107

Filed July 29, 1983.   No. 82-326.

Jewell, Otte, Gatz & Collins, for appellants.

Gene D. Watson and John C. McClure, for appellee NPPD.

KRIVOSHA, C.J., BOSLAUGH, MCCOWN, WHITE, HASTINGS, CAPORALE, and SHANAHAN, JJ.

HASTINGS, J.

This litigation originated with the filing by the Nebraska Public Power District (NPPD), a public corporation and political subdivision of the State of Nebraska, of two applications with the Nebraska Power Review Board (Board), requesting authorization to construct a 500 kV transmission line and a 500/345 kV substation in northeast Nebraska as a part of the proposed "MANDAN Project."

The "MANDAN Project" is a proposed international and interstate transmission facility which includes, in the United States, a transmission line extending from the Canadian border that connects to substations in North Dakota, South Dakota, and Ne-

braska. The line is to connect at the United States-Canadian border with a transmission line to be constructed by the Manitoba Hydro-Electric Board of Manitoba, Canada. The purpose of the project is to allow for a seasonal diversity exchange of electric power and energy between summer-peaking utilities such as NPPD, on the one hand, and Canadian utilities, on the other, whose peak demand historically has been in the wintertime. Canada's surplus power is hydro generated, a renewable resource with alleged resulting economic cost control for the benefit of the applicant's power and energy customers.

Protests were filed by the Nebraska Safe Energy Alternatives, Inc., and several individuals, claiming that the applications for construction of the MANDAN Project would not serve the public convenience and necessity; that the construction would not be economically feasible and would result in a duplicity of services; that the safety of the project had not been demonstrated, nor the environmental impact established; and that the State of South Dakota had not granted permission to the applicant to build the connecting extension of the lines across that state. The Nebraska Electric Generation and Transmission Cooperative, Inc., was permitted to intervene in support of the application.

Following a 2-day evidentiary hearing commencing on January 27, 1982, the Board made detailed findings which favored the applications, and it approved the same. The protestants Nebraska Safe Energy Alternatives, Inc., and Howard Wheeler, its president, have appealed that decision to this court. The errors assigned are: (1) The Board erred in refusing to conduct an independent investigation into the merits of the proposed project; (2) The Board erred in sustaining objections to the offer by the protestants of certain testimony originally offered before the South Dakota Public Utilities Commission hearings relating to the "Mandan Line" as proposed across the State of South Dakota; (3) The Board

erred in failing to give full faith and credit to the decision of the South Dakota Public Utilities Commission's decision, and in determining that the doctrines of collateral estoppel and res judicata as to that decision did not apply to the hearing before the Board; (4) The Board's orders of approval are not supported by the evidence and are unreasonable and arbitrarily made; and (5) The Board has exceeded its authority in the manner in which it has acted.

We will consider the last two assignments of error first. Neb. Rev. Stat. § 70-1014 (Reissue 1981) provides that, following hearings on applications such as these, the Board may approve or deny the applications; but before approval may be granted, "the board shall find that the application will serve the public convenience and necessity, and that the applicant can most economically and feasibly supply the electric service resulting from the proposed construction or acquisition, without unnecessary duplication of facilities or operations."

In its orders granting the applications the Board found that "The proposed 'MANDAN Project' will serve the public convenience and necessity, and the applicant, NPPD can most economically and feasibly supply the electric service resulting from the proposed construction without unnecessary duplication of facilities or operations." Clearly, the findings satisfy the statutory requirements, which quite obviously are limited to the public convenience and necessity of the citizens of this state.

Upon review of an order of the Nebraska Power Review Board, we are guided by the rule that determination of what is consistent with the public convenience and necessity is a question of fact peculiarly for the determination of the Board. This court may question only whether the Board acted within the scope of its authority and if the order complained of is supported by the evidence and is reasonable and not arbitrarily made. *Lincoln*

*Electric System v. Terpsma*, 207 Neb. 289, 298 N.W.2d 366 (1980).

Although not conceding the point, the protestants do not seriously argue that the record as made does not support the findings and order of the Board. We see nothing to be gained by setting forth in detail the evidence submitted to the Board. It was peculiar to this case and would serve no precedential purposes.

The Board did find from the evidence that Manitoba Hydro is an electric utility with increasing winter power and energy demands, whereas NPPD in the same manner is realistically looking at increased summer demands. Such demands, the Board found, were supported by persuasive evidence based on planning and forecasting. The Board determined that the MANDAN Project would not duplicate existing facilities. Also examined in detail by the Board were the five alternatives proposed by NPPD to meet its future needs, including the MANDAN Project, oil-fired generation units, coal-fired generation units, pumped-hydro storage units, and purchased power, and concluded that the MANDAN Project would provide the most economical alternative, representing a savings to the taxpayers of *Nebraska* of $568 million, in 1980 dollars, over the 1987-2005 time frame.

Suffice it to say, disregarding for the moment the excluded testimony, our examination of the record leads us to conclude that the evidence supports the findings made by the Board and clearly establishes that the projects approved by the Board will serve the public convenience and necessity, and are neither arbitrary nor capricious.

However, we must now determine whether evidence excluded by way of the absence of an independent investigation on the part of the Board would alter our conclusion. We have no way of knowing what evidence such an investigation would disclose, and, normally, in the absence of an offer of proof as to excluded evidence, no error can be determined.

Therefore, it is necessary for us to consider whether such an investigation was of a mandatory nature so as to require us to conclude that its absence per se made the action of the Board arbitrary and without authority.

Statutory law makes no provision for such an investigation. Rule 28 of the Revised Rules of Practice and Procedure of the Nebraska Power Review Board (1975) provides in part: "The Board *may* at any time on its own motion, make a formal or informal investigation into any matter within its jurisdiction, or order any hearing which the Board is authorized, either by law or inherent power, to conduct. *In the event* of an investigation, the Board may request the attendance of any party. *In the event* of such request . . . ." (Emphasis supplied.) Webster's Third New International Dictionary, Unabridged (1968), defines *may* as "2 a : have permission to."

In recent years this court has on occasion been asked to construe the meaning of the word *may*, as used in statutes or rules. In *State ex rel. Hubbard v. Northwall*, 150 Neb. 894, 896-97, 36 N.W.2d 282, 283-84 (1949), we said: "The word 'may' is used in the statute. The word on its face denotes a discretionary power in the board. . . .

. . . .

". . .'Without doubt the word "may" in public statutes should be construed as "must" whenever it becomes necessary, in order to carry out the intent of the legislature, but in all other cases this word, like any other, must have its ordinary meaning.' " See *Flood v. Keller*, 214 Neb. 797, 336 N.W.2d 549 (1983). Paraphrasing further the language of *Hubbard* at 897, 36 N.W.2d at 284, there is nothing in the rule cited in the instant case which could give rise to any conclusion that the Board intended other than to lodge in itself the discretion to conduct or not con-

duct an independent investigation. There is no merit to the protestants' first assignment of error.

At the request of the protestants they were permitted to tender their evidence in opposition to the applications first and then leave the hearing. None of their evidence consisted of live testimony, but was all documentary in nature, and all of it was excluded on objection by NPPD. The protestants claim that because rule 23 of the Revised Rules of the Board, *supra*, provides in part that the Board is not bound to follow the technical common-law rules of evidence and that evidence shall be admissible which possesses probative value, the Board erred in its ruling.

The evidence offered by the protestants consisted of several volumes of testimony originally presented at a hearing before the South Dakota Public Utilities Commission. Their offer included:

52 pages of testimony of Whitfield A. Russell, including both questions and answers, and preprepared statements, tables and graphs, relating in part to the feasibility of other potential alternatives to the "MANDAN Project";

17 pages of testimony by Stephen P. Flanagan, an associate of Whitfield A. Russell, together with supporting tables, purporting to be rebuttal testimony on the question of need of the MANDAN transmission facility;

41 pages of testimony by John W. Wilson, contesting the validity of NPPD's load-forecasting models, which are identified in the record as consisting of only exhibit 5, but in fact his testimony is included in both exhibits 5 and 6;

the testimony of James Weaver, which is identified in the protestants' offer as exhibit 6, but, as previously indicated, covers that of John W. Wilson;

exhibit 7, identified in the record as testimony of Stephen P. Flanagan, referred to in the brief as testimony of James Weaver, which in fact contains tes-

timony by Dale Osborn, a Miss Eide, Paul Seeley, and James Weaver;

exhibit 8, 130 pages of testimony which is represented in the record to be testimony of Whitfield A. Russell, and stated in the brief to be testimony of Stephen P. Flanagan, but which in fact contains partial testimony of Robert M. Spahn and of John W. Wilson;

testimony of James Drzemiecki, identified in the record as appearing variously in exhibits 9, 9a, and 10, which in fact is found in exhibit 10, concerned, in part at least, with the electrical energy needs of center pivot irrigation as compared to gravity flow; and

the 102-page document labeled "Findings of Fact, Conclusions of Law, and Decision and Order Denying Permit," entered by the Public Utilities Commission of the State of South Dakota on January 14, 1982.

From a reading of the rather laborious description of the proffered evidence, it must be apparent that it presented to the trial tribunal and this court a series of confusing and conflicting exhibits. A fair reading of rule 24 of the Revised Rules of the Board, previously mentioned, would seem to require that where voluminous documents are offered in evidence it is necessary that the relevant portions thereof be plainly designated and indexed so as to be distinguished from the irrelevant portions. Neither the administrative agency hearing a case in the first instance nor this court on review should bear the burden of sifting through a voluminous record in order to determine whether there is anything probative of the particular issue to be determined.

Furthermore, it is doubtful that evidence presented in a hearing to determine what might be in the public interest in one state is relevant to a consideration of that issue in another state. A determination of the relevancy of evidence generally rests within the sound discretion of the trial tribunal.

*State v. Martin*, 198 Neb. 811, 255 N.W.2d 844 (1977). The Board did not err in rejecting the offered evidence.

The order of the Public Utilities Commission of the State of South Dakota, dated January 14, 1982, related to a hearing seeking permission to construct the "MANDAN Project" across the State of South Dakota. In that order, the South Dakota commission had found that NPPD had failed to establish the public convenience and necessity of the "proposed trans-state transmission facility . . . in any area or areas which will receive electrical service . . . from the facility, regardless of the state or states in which such area or areas are located." This offer was also rejected by the Board. What we have just declared regarding the testimony of the various witnesses at that South Dakota hearing applies with equal effect to this document. However, the protestants insist that such order must be afforded full faith and credit by the Board and that the doctrines of res judicata or issue preclusion and collateral estoppel apply to these proceedings. We do not agree.

Assuming that we afford "full faith and credit" to the order of the South Dakota commission, the question still remains, Does the doctrine of issue preclusion apply where the regulatory commissions of two sovereign states are charged with the responsibility of determining the public convenience and necessity as to each state of an application to furnish electrical service? We believe that the obvious answer is no.

The protestants rely heavily on *Bowen v. United States*, 570 F.2d 1311 (7th Cir. 1978), in support of their position. However, that case involved a fact question as to whether the pilot of an airplane at the time of a crash had violated a safety regulation by flying his airplane into a known icing condition without having deicing equipment on his aircraft, contrary to federal aviation rules. In a license suspension hearing the National Transportation Safety

Board answered the question in the affirmative and entered an order suspending the pilot's license. In a suit by this same pilot against the United States of America, alleging negligence on the part of the air traffic controllers, the same issue as to whether the pilot had violated a safety regulation was presented to the court. The court simply held that the doctrine of collateral estoppel by reason of issue preclusion applies to a final administrative determination as well as a judicial finding. That does not answer the question here, i.e., Was the *identical* issue to be decided by the Board previously decided by the South Dakota commission?

We have said in *Peterson v. The Nebraska Nat. Gas Co.*, 204 Neb. 136, 139, 281 N.W.2d 525, 527 (1979): "It is now generally held that collateral estoppel may be applied if the *identical* issue was decided in a prior action, there was a judgment on the merits which was final, the party against whom the rule is to be applied was a party or in privity with a party to the prior action, and there was an opportunity to fully and fairly litigate the issue in the prior action." (Emphasis supplied.)

The issue to be decided by the Board was whether this application "will serve the public convenience and necessity [of the State of Nebraska], and that the applicant can most economically and feasibly supply the electric service . . . without unnecessary duplication of facilities or operations." § 70-1014. Of course, the bracketed portion of the quotation does not appear in the section cited. It is, nevertheless, a truism.

The Nebraska Power Review Board was created by Neb. Rev. Stat. §§ 70-1001 et seq. (Reissue 1981). Section 70-1001 provides that in order "to provide the *citizens of the state* with adequate electric service . . . it is the policy of *this state* to avoid and eliminate conflict and competition . . . and eliminate the duplication of facilities and resources . . . ." (Emphasis supplied.) Section 70-1003 establishes

"an independent board to be known as the Nebraska Power Review Board . . . ." Section 70-1012 requires that permission to construct generation or transmission facilities (within the state) must be secured from the Board.

As stated in K. Davis, Administrative Law Text, *Res Judicata* § 18.04 at 363 (3d ed. 1972): "What appears to be an identity of issues may not be when the two cases arise under different statutes; even if the two statutes appear identical, the policy under them may differ." See, also, *Pacific Seafarers, Inc. v. Pacific Far East Line, Inc.*, 404 F.2d 804 (D.C. Cir. 1968); *Thompson v. Flemming*, 188 F. Supp. 123 (D. Or. 1960).

There is nothing in the record to indicate that the standard for determining "public convenience and necessity" in South Dakota is the same as it is in Nebraska. Even so, what constitutes "public convenience and necessity" is primarily a fact question with a number of imponderables to be taken into consideration. The facts in each case must be separately considered, and from those facts it must be determined whether public convenience and necessity require a given service to be performed. *Utilities Comm. v. Coach Co. and Utilities Comm. v. Greyhound Corp.*, 260 N.C. 43, 132 S.E.2d 249 (1963).

The grant or denial of an application of a utility company, based on "public convenience and necessity," by the administrative agency charged with the responsibility for supervising such industry requires the exercise of administrative and legislative functions. *Furstenberg v. Omaha & C.B. Street R. Co.*, 132 Neb. 562, 272 N.W. 756 (1937).

The determination of the "public convenience and necessity" in Nebraska is not an issue which is identical to a similar determination made in another state.

The order of the Nebraska Power Review Board is affirmed.

AFFIRMED.