IN RE COMPLAINT OF THE FEDERAL LAND BANK OF OMAHA. FEDERAL LAND BANK OF OMAHA, APPELLANT, V. MIDWEST ELECTRIC MEMBERSHIP CORPORATION, APPELLEE.

395 N.W.2d 488

Filed October 24, 1986.   No. 85-493.

James J. DeMars of Barlow, Johnson, DeMars & Flodman, for appellant.

Patrick R. McDermott, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

The Federal Land Bank of Omaha complained to the Nebraska Power Review Board that Midwest Electric Membership Corporation declined the bank's applications for electric service to power each of the two irrigation wells on certain lands the bank had acquired. Midwest Electric's refusal to supply electricity was based on the grounds that there were delinquent charges due Midwest Electric from the previous owners of the lands and that the bank's applications were untimely. The board found that the bank's applications were untimely and dismissed the complaint. In its appeal to this court the bank assigns as operative errors the board's (1) failure to find that the bank is not responsible for the charges due Midwest Electric from the prior owners and (2) finding that Midwest Electric had a right to enforce its application deadline. We reverse and remand with the direction that the board order Midwest Electric to approve the bank's applications.

The bank held a first mortgage on certain irrigated croplands owned by Mahloch Farms, Inc., in Perkins County, which were farmed by its tenant, Melvin Wasserman. For several years Midwest Electric had been supplying electric service to Mahloch Farms and, in accordance with Mahloch Farms' instruction, billed Wasserman. In 1983 Mahloch Farms filed for protection under the federal bankruptcy laws. On the advice of its attorney

that the bankruptcy court would be responsible for electricity charges, Midwest Electric continued to provide Mahloch Farms with electric service and to bill Wasserman. Midwest Electric did not at any time submit any bills to the trustee in bankruptcy, explaining that bankruptcy proceedings were a "new thing" for it.

At some time, Wasserman quit farming the lands. As a consequence, on March 2, 1984, the trustee entered into a lease with Dennis Hutt, whereby Hutt farmed the lands as a tenant of the trustee. On September 19, 1984, the trustee conveyed title in and to the lands to the bank. The trustee's deed was filed in the office of the Perkins County clerk on September 28, 1984.

In the meantime, Midwest Electric continued to send bills to Wasserman. Around the time Hutt's lease expired, February 28, 1985, Midwest Electric sent a notice of disconnection to Wasserman, and service was disconnected in April of 1985. The bank then contacted Midwest Electric and learned for the first time that there were past-due electric bills in the amount of $38,279.43 for electricity furnished to Mahloch Farms. Midwest Electric advised the bank it would receive no electricity until those bills were paid, and the bank filed its applications on April 12, 1985.

There is evidence that for the past 35 years Midwest Electric has had a policy of not providing service if its bills during the past season have not been paid, although in this case Midwest Electric provided service for the 1984 irrigation season even though bills from the 1983 irrigation season went unpaid. Midwest Electric also had an unwritten policy which set an application deadline of October 1, 1984, for electricity to be delivered during the next irrigation season. The policy had been waived in several cases and did not apply to any property already receiving electricity, because the contracts for electrical service contained a "succession clause" continuing service from year to year. The application deadline policy was adopted around 1974, when Midwest Electric had backlogs of 3 or 4 years in providing electric power. Midwest Electric had no backlog when it denied the bank's applications, and the testimony of Midwest Electric's general manager was that if there had been no past-due bills, the bank would not have had

to reapply for electric service.

The only physical action required to provide the bank with electricity would be to reconnect some line clamps, an easy process involving a two-man crew for a short time. In addition, some bookkeeping might be involved in reestablishing electrical service.

In rendering its decision the board found:

Midwest has established a policy that applications for the upcoming irrigation season must be made no later than October 1 of the year preceding the period for which the irrigation service is requested. The Board FINDS the policy of Midwest is reasonable and economically feasible as prescribed by the Nebraska Statutes, 70-1017, R.R.S., 1943, because in order to control the growth of irrigation service they [sic] must be able to regulate the peak demands on MEMC's electrical system. By using a systematic method of controlling the growth of peak demand, Midwest is able to plan for upcoming periods of time, not only properly controlled load growth but other things as well including rates and the necessary time needed for construction for provision of electrical service to new customers.

Contrary to the claim made in connection with the bank's first operative assignment of error, the board properly declined to determine whether a supplier of electricity may refuse to supply electricity to a subsequent owner of land unless and until such subsequent owner pays the past-due electric use charges incurred by the prior owner of land, for the board does not have the power or authority to decide that question.

The board has no power or authority not specifically conferred upon it by statute or by construction necessary to accomplish the purpose of the statute. *Lincoln Electric System v. Terpsma*, 207 Neb. 289, 298 N.W.2d 366 (1980); *City of Auburn v. Eastern Nebraska Public Power Dist.*, 179 Neb. 439, 138 N.W.2d 629 (1965).

It has been said the board exists to avoid and eliminate conflict and competition among suppliers of electricity, to avoid and eliminate duplication of facilities and resources, and to facilitate the settlement of rate disputes; all to the end of

providing Nebraskans with adequate electric service at as low an overall cost as possible. *Lincoln Electric System v. Terpsma, supra*; Neb. Rev. Stat. § 70-1014 (Reissue 1981).

Specifically, Neb. Rev. Stat. § 70-1017 (Reissue 1981) provides:

> Any supplier of electricity at retail shall furnish service, upon application, to any applicant within the service area of such supplier if it is economically feasible to service and supply the applicant. The electric service shall be furnished by the supplier within a reasonable time after the application is made. If the supplier and the applicant cannot agree upon any of the terms under which service is to be furnished, or if the applicant alleges that the supplier is not treating all customers and applicants fairly and without discrimination within the same rate class, the matter shall be submitted to the board for hearing and determination.

Payment of another's past-due electric use charges is not a term "under which service is to be furnished" of the nature which § 70-1017 empowers the board to consider. The "terms under which service is to be furnished" relate to those matters for which the board exists; for example, the avoidance and elimination of conflict and competition among suppliers of electricity, the avoidance and elimination of the duplication of facilities and resources, and the facilitation of rate dispute settlements. See *In re Complaint by Morris Tp.*, 49 N.J. 194, 206, 229 A.2d 516, 522 (1967), which states " 'to the extent, for such length of time and under such terms and conditions as may be ordered . . .' " was to be read in light of the purpose to be accomplished by the board of public utility commissioners.

We thus move on to the second assignment, that the board erred in finding Midwest Electric had a right to enforce its application deadline.

In order to resolve the issue this assignment presents, we must first reacquaint ourselves with the scope of this court's review. Neb. Rev. Stat. § 70-1016 (Reissue 1981) provides that an appeal from the board may be taken to this court "in the same manner as appeals are taken from decisions of the Public Service Commission." We have held that an action of the Public

Service Commission will be affirmed on appeal if it is supported by evidence in the record and is not arbitrary, capricious, unreasonable, or otherwise illegal. *In re Application of Regency Limo*, 222 Neb. 684, 386 N.W.2d 444 (1986); *In re Application of Northwestern Bell Tel. Co.*, 218 Neb. 563, 357 N.W.2d 443 (1984). Thus, while we have held that the evidentiary rules contained in Neb. Rev. Stat. § 84-914 (Reissue 1981) apply to matters before the board, *City of Lincoln v. Nebraska P.P. Dist.*, 191 Neb. 556, 216 N.W.2d 722 (1974), we have determined that a decision of the board, unlike one arising under Neb. Rev. Stat. § 84-918 (Reissue 1981), is to be affirmed if it is supported by the evidence and is reasonable and not arbitrary. *In re Applications of Nebraska P.P. Dist.*, 215 Neb. 8, 337 N.W.2d 107 (1983); *Lincoln Electric System v. Terpsma, supra.* (Appeals arising under § 84-918 are reviewed by this court de novo on the record. *Department of Health v. Grand Island Health Care, ante* p. 587, 391 N.W.2d 582 (1986); *Haeffner v. State*, 220 Neb. 560, 371 N.W.2d 658 (1985).)

The decision of the board is not, however, supported by the evidence and is therefore unreasonable and arbitrary. There is nothing in the record which demonstrates that denial of the bank's applications has anything to do with competition, facilities, resources, or rate disputes, or, for that matter, with anything mentioned in the board's order. Midwest Electric's own evidence is that but for the fact that the prior owners did not pay for electricity provided to them, the bank, as the successor owner of the lands, would not have needed to reapply for continued service. Moreover, such reason as may have existed for the deadline policy no longer obtains, and, more importantly, electricity was being provided to the bank at the time of the unpublished deadline. The sole logical conclusion compelled by the evidence is that Midwest Electric's deadline policy does not apply to the case before us.

The board's decision is reversed and the cause remanded with instruction that the board order Midwest Electric to approve the bank's applications.

REVERSED AND REMANDED WITH DIRECTION.