STATE OF NEBRASKA, ON BEHALF OF THE MINOR CHILD J.R.,
APPELLEE, V. JOSE MENDOZA, APPELLANT.
481 N.W.2d 165

Filed March 6, 1992.    No. S-89-494.

Kevin Ruser for appellant.

Gary E. Lacey, Lancaster County Attorney, James P. Rocke, Douglas D. Cyr, and Andrew R. Jacobsen for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

## NATURE OF THE CASE

This is a paternity suit commenced by the Lancaster County Attorney, pursuant to Neb. Rev. Stat. § 43-512.03 (Reissue 1984). In its petition the State alleges that P.C. is receiving public assistance, commonly known as ADC payments, on behalf of her minor child J.R. The petition further alleges that the defendant-appellant, Jose Mendoza, is the natural father of J.R. The State therefore seeks a judgment to that effect and an order requiring the defendant to support the child.

The defendant answered, denying he is the child's father. He later moved for an order joining Jesus S. Castillo, P.C.'s husband at the time of trial, as an indispensable party to the suit. The trial court overruled this motion, as well as the defendant's motion for summary judgment, and the case proceeded to trial on February 9, 1989. On April 24, the trial court entered an order finding that the defendant is the father of J.R. and thus obligated to support him. On May 24, the court held a hearing on the defendant's financial status and entered a decree ordering the defendant to pay $175 per month in child support and to provide health insurance for the child if available to the defendant through his employer or any other organization. From this decision the defendant appeals.

## STATEMENT OF THE FACTS

The record reveals that P.C. met the defendant sometime in 1980. They engaged in sexual intercourse regularly between April and September 1981, without availing themselves of any

form of birth control. P.C. testified that during this time period she did not engage in intercourse with anybody except the defendant.

P.C. took a pregnancy test in May 1981, which the defendant paid for. The results were positive. When P.C. told the defendant she was pregnant, he first responded with profanity and then requested that she name the child after him if it was a boy. P.C. gave birth to J.R. on March 3, 1982. The defendant visited P.C. at the hospital that day, held the boy, and said the boy was beautiful. P.C. testified that the defendant admitted on several occasions to fathering the child. She also testified that the defendant bought food and diapers and provided money to buy clothes for the boy. During the summer of 1982, the defendant paid a $100 deposit so that P.C. and the child could move into an apartment in the same building he lived in. P.C. testified that the defendant did so because he wanted to get to know his son and that the defendant took care of the boy when she was gone.

P.C. married Castillo on February 11, 1983. Three children were born of the marriage, and Castillo supported them, as well as J.R., by providing them food, clothes, and shelter. Castillo showed affection for J.R. and bought him Christmas and birthday presents. There is evidence that J.R. regards Castillo as his father and calls him "Daddy."

On August 2, 1984, Castillo signed a sworn "Application for Immigrant Visa and Alien Registration." In response to a question asking for the names, addresses, and dates and places of birth of all "children," the name of J.R. is listed. Castillo testified, however, that somebody else added this information after he signed the form. Further, on September 18, 1985, Castillo signed a notarized document acknowledging himself as J.R.'s biological father, this time for the purpose of acquiring a new birth certificate reflecting the child's name as "Jose de Jesus Castillo" and himself as the father. See Neb. Rev. Stat. § 71-628 (Reissue 1990).

Despite these documents, both P.C. and Castillo testified at trial that Castillo is not J.R.'s natural father. Further, pursuant to the State's motion, blood tests were taken of P.C., Castillo, the defendant, and the boy. A doctor testified that based on

these tests, Castillo is not the boy's natural father. The same doctor also testified that based on a "combined paternity index," there is a probability of 98.23 percent that the defendant fathered the child.

### ASSIGNMENTS OF ERROR

On appeal, the defendant argues that the trial court erred in (1) failing to find that Castillo's actions acknowledging J.R. as his son bar this suit and (2) failing to grant his motion to join Castillo as an indispensable party.

### CASTILLO AS A NECESSARY PARTY

In Nebraska,

> " ' " 'Indispensable parties to a suit are those who not only have an interest in the subject matter of the controversy, but also have an interest of such a nature that a final decree cannot be made without affecting their interests, or leaving the controversy in such a condition that its final determination may be wholly inconsistent with equity and good conscience. . . .' " ' "

*Helter v. Williamson*, 239 Neb. 741, 743, 478 N.W.2d 6, 7 (1991), quoting *Koch v. Koch*, 226 Neb. 305, 411 N.W.2d 319 (1987). When the determination of a controversy is impossible without the presence of other parties, the district court *must* order them brought in. See Neb. Rev. Stat. § 25-323 (Reissue 1989). Therefore, if Castillo is an indispensable party to this suit, the trial court committed reversible error in denying the defendant's motion to join him.

The defendant argues that our decision in *Helter* requires a holding in this case that Castillo is a necessary party. *Helter* involved a custody suit in which the plaintiff Helter claimed to be the biological father of a child conceived and born during the marriage of Margaret and Tracy Williamson. Though Margaret Williamson did not deny the plaintiff's assertion that he fathered the child, she was awarded custody. This court reversed and remanded with directions to join Tracy Williamson as an indispensable party. The court based its decision on the ancient presumption that children born during a marriage are legitimate, noting that "[t]he presumption prevents nonparents from arriving on the scene, either during

or after the marriage, and staking claims, parental visitation rights, and responsibilities without the knowledge or consent of the true parent." *Helter*, 239 Neb. at 743, 478 N.W.2d at 8.

The defendant's reliance on *Helter* is misplaced. There, the plaintiff sought a determination of paternity for the purpose of establishing his parental right to custody of the child. Because awarding custody to the plaintiff would dramatically affect the presumed father's legal interest in custody, we held that it was necessary to join the presumed father to adequately protect this important interest. In this case, however, the State seeks a determination of paternity for the sole purpose of obtaining support payments from the defendant. The State's interest is primarily financial, in that it is attempting to recoup moneys paid out of public coffers to support the child from the party morally responsible for that support. See Neb. Rev. Stat. § 43-512.07 (Supp. 1991) (acceptance of aid to dependent children payments by a parent constitutes an assignment of the right to support payments to the Department of Social Services up to the amount paid).

An order obligating the defendant to make periodic support payments in no way prejudices Castillo's legal interests. As noted in the plurality opinion by Justice Scalia of the U.S. Supreme Court in *Michael H. v. Gerald D.*, 491 U.S. 110, 126, 109 S. Ct. 2333, 105 L. Ed. 2d 91 (1989):

> [W]hat is at issue here is not entitlement to a state pronouncement that Victoria was begotten by Michael. It is no conceivable denial of constitutional right for a State to decline to declare facts unless some legal consequence hinges upon the requested declaration. What Michael asserts here is a right to have himself declared the natural father *and thereby to obtain parental prerogatives.*

(Emphasis in original.) Though asserted in a slightly different context, Justice Scalia's reasoning is directly applicable here. The opportunity to contest the paternity of a child is only meaningful as it relates to the legal consequences which flow from such a determination. In *Helter*, the presumed father had a vital interest in contesting the issue of paternity only because determination of that issue could have substantially affected his parental prerogative of child custody. Here, however, Castillo's

parental prerogatives are not at stake. No rights of visitation or custody are at issue, and an award of the relief sought in no way alters Castillo's obligation to support the child. See Neb. Rev. Stat. § 28-705(1) (Reissue 1989) (making it a crime to abandon or neglect a dependent stepchild, even if the child was born out of wedlock).

Not only is there no effect on Castillo's interests from a finding of paternity in this case, but such a finding does not preclude him from relitigating the issue in a future lawsuit which does affect his interests. In *Comr. of Public Welfare v. Koehler*, 284 N.Y. 260, 30 N.E.2d 587 (1940), the New York Court of Appeals held that neither the child nor the husband of the mother is a necessary party to a paternity proceeding. In so doing, the court reasoned that

> [t]he order made in such a proceeding does not constitute an adjudication binding on them or persons claiming through or under them that the child is or is not the legitimate offspring of married parents. An order adjudging that some person other than the mother's husband is the father of the child and ordering him to provide for its support is, it is plain, not a binding adjudication of illegitimacy. It does not establish the status of the child nor would it be competent evidence to establish illegitimacy in any proceeding to which others are parties.

*Id.* at 267, 30 N.E.2d at 590-91. This reasoning clearly applies in Nebraska as well.

In Nebraska, the doctrine of collateral estoppel applies only if four conditions are met: (1) The identical issue was decided in a prior action, (2) there was a judgment on the merits which was final, (3) the party *against* whom the rule is applied was a party or in privity with a party to the prior action, *and* (4) there was an opportunity to fully and fairly litigate the issue in the prior action. *In re Applications of Nebraska P.P. Dist.*, 215 Neb. 8, 337 N.W.2d 107 (1983). Therefore, a finding in this case that the defendant fathered the child could not be asserted *against* Castillo in a subsequent suit in which his legal interests hinged on a finding of paternity. For example, should J.R. later die intestate, the finding made in this case would not prevent

Castillo from asserting a claim for a share of the estate and relitigating the issue of paternity. The same is true should Castillo wish to assert rights of visitation or custody based on the allegation that he fathered the child.

To be sure, the defendant could have admitted paternity, willingly accepted his support obligation, and sought rights of visitation, custody, or a change of the child's surname. See, *Cox v. Hendricks*, 208 Neb. 23, 302 N.W.2d 35 (1981) (in a paternity suit issues of custody and visitation fall within the general equity jurisdiction of the district court); *Lancaster v. Brenneis*, 227 Neb. 371, 417 N.W.2d 767 (1988) (a court exercising jurisdiction in a filiation proceeding has the discretion to change the child's surname from that of the mother to that of the natural father). Such a case would present an altogether different question as to the necessity of joining Castillo.

Though the trial court denied the defendant's motion to join Castillo as an indispensable party, it did order that the State serve him with notice of the pendency of the suit. Though he at all times retained the right to intervene, he did not do so. See Neb. Rev. Stat. § 25-328 (Reissue 1989). His failure to do so is further indication that his legal interests are simply unaffected by this lawsuit. He and P.C. already knew that he did not father the child; they admitted as much at trial. As discussed above, no rights regarding custody, visitation, or the name of the child are at issue here—only the financial obligation of the defendant to contribute to the child's support. Because the imposition of such an obligation could in no way prejudice Castillo, he is not a necessary party to this suit. The defendant's second assignment of error is without merit.

### EFFECT OF CASTILLO'S WRITTEN ACKNOWLEDGMENT OF PATERNITY

For his first assignment of error, the defendant argues that the State is estopped from pursuing this action. Subsumed in the defendant's first assignment of error is an argument regarding the effect of Neb. Rev. Stat. § 43-1409 (Reissue 1988). The statute provides in part that

[a] person may state in writing that he is the father of a child or perform acts, such as furnishing of support,

which reasonably indicate that he considers himself to be the father of such child, and in such case he shall be considered to have acknowledged the paternity of such child.

The defendant insists § 43-1409 must be read in conjunction with Neb. Rev. Stat. § 43-1406 (Supp. 1991), which provides that "[t]he father of a child whose paternity is established either by acknowledgment or by a judicial proceeding as hereinafter specified . . . may be made the defendant in an equitable proceeding for the support of the child."

From these statutory provisions, the defendant constructs the following argument: (1) The father of a child born out of wedlock is liable for the child's support; (2) a man may become the "legal father" of a child born out of wedlock either through a formal court proceeding or by acknowledgment; (3) Castillo, by signing the birth certificate and immigration forms and providing support for the child, became J.R.'s legal father by acknowledgment; (4) a child may not have more than one father; and therefore (5) Castillo is obligated to support the child and the defendant is not.

In support of this argument the defendant cites *Sanders v. Sanders*, 384 Pa. Super. 311, 558 A.2d 556 (1989). In that case Ernestine Sanders divorced James Walker and, in 1972, obtained a consensual support order regarding a child born during the marriage. In 1985, Ernestine Sanders filed a complaint seeking support of the same child against Mike Sanders, alleging that he in fact fathered the child. The trial court ordered blood tests, and Mike Sanders objected. Mike Sanders ultimately appealed from an order holding him in contempt for refusing to submit to the blood tests.

The Pennsylvania Superior Court reversed the trial court's contempt order. In so doing, the court held that the doctrine of collateral estoppel barred relitigation of the paternity issue. The court stated:

Although it is certainly possible that Sanders is the child's biological father, once paternity in Walker had been determined as a matter of law, paternity was no longer a relevant fact. A mother simply cannot attempt to establish paternity in someone after paternity has already been

established under the law; she cannot seek and receive child support from two men for the same child. This is a legal impossibility.

*Sanders*, 558 A.2d at 560.

Here, the defendant argues that because § 43-1409 provides for the establishment of paternity by either judicial proceeding *or* acknowledgment, Castillo's acknowledgment of parenthood should have the same preclusive effect in this case as the prior judicial proceeding had in *Sanders*. The defendant's argument raises the issue of whether a sworn acknowledgment of paternity filed with the department of vital statistics for purposes of obtaining a new birth certificate conclusively establishes the party executing it as the child's "legal father." For the following reasons we decline to give such an acknowledgment conclusive effect.

The defendant relies heavily on Nebraska's "long-standing public policy" of preventing the bastardization of children in asserting his interpretation of § 43-1409. Brief for appellant at 18. Though certainly an important consideration, the defendant's argument overstates the significance of this policy in construing the statute.

The Louisiana Supreme Court addressed a similar issue in *Smith v. Cole*, 553 So. 2d 847 (La. 1989). There, Ledora Smith married Henry Smith in 1970. In 1974 they separated, and Ledora Smith began living with Playville Cole. The following year Ledora Smith gave birth to a child. The child's birth certificate named Henry Smith as the child's father. The Smiths divorced in 1978, and Ledora Smith subsequently brought suit against Cole seeking a determination of paternity and a support order for the child. The trial court dismissed the suit on grounds that a mother cannot rebut the presumption that the husband of the mother at the time of conception is the child's father, and thus bastardize the child, for purposes of obtaining a support order. An intermediate court of appeals reversed the trial court's decision, and Cole appealed.

On appeal, the state's highest court affirmed the decision of the court of appeals and reinstated the mother's cause of action. The court recognized the historic vitality of the presumption of legitimacy as a buffer against the harsh social and legal

consequences of illegitimacy. However, the court recognized that decisions of the U.S. Supreme Court prohibiting discrimination against illegitimate children have "weathered away" the legal disadvantages of illegitimacy. *Id.* at 850 n.4 (citing *Levy v. Louisiana*, 391 U.S. 68, 88 S. Ct. 1509, 20 L. Ed. 2d 436 (1968); *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 92 S. Ct. 1400, 31 L. Ed. 2d 768 (1972); and *Gomez v. Perez*, 409 U.S. 535, 93 S. Ct. 872, 35 L. Ed. 2d 56 (1973)). The court also noted decisions affording greater protection to the rights of biological fathers who establish actual relationships with children born out of wedlock. *Smith*, 553 So. 2d at 851 (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); *Quilloin v. Walcott*, 434 U.S. 246, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978); *Caban v. Mohammed*, 441 U.S. 380, 99 S. Ct. 1760, 60 L. Ed. 2d 297 (1979); and *Lehr v. Robertson*, 463 U.S. 248, 103 S. Ct. 2985, 77 L. Ed. 2d 614 (1983)). But, cf., *Michael H. v. Gerald D.*, 491 U.S. 110, 123, 109 S. Ct. 2333, 105 L. Ed. 2d 91 (1989) (rights of putative fathers of children born out of wedlock rest upon historic respect traditionally accorded relationships that develop within the unitary family and not upon a simple "biological fatherhood plus" test).

Given these trends in the law, the Louisiana court concluded that public policy favors a "dual paternity" scheme in which the mother of a child born out of wedlock may bring a filiation proceeding for support against a putative father despite the existence of another "legal father." The lack of significant legal consequences of such a determination, combined with the inequity of granting biological fathers certain rights without also imposing on them certain responsibilities, convinced the court to embrace such a scheme. The court stated:

> The presumption was intended to protect innocent children from the stigma attached to illegitimacy and to prevent case-by-case determinations of paternity. It was not intended to shield biological fathers from their support obligations. . . . The presumed father's acceptance of paternal responsibilities, either by intent or default, does not enure to the benefit of the biological father. It is the fact of biological paternity or maternity which obliges parents to nourish their children.

*Smith*, 553 So. 2d at 854. See, also, *C.C. v. A.B.*, 406 Mass. 679, 550 N.E.2d 365 (1990) (abrogating proof beyond a reasonable doubt standard for rebutting the presumption of legitimacy in light of improving legal position of children born out of wedlock and greater recognition of rights of unwed putative fathers).

As the Louisiana and Massachusetts Supreme Courts have recognized, the legal status of children born out of wedlock is much more favorable today than in the past. Thus, the necessity of indulging in legal fictions in order to steadfastly protect their legal status is somewhat lessened. See, e.g. Neb. Rev. Stat. § 30-2309 (Reissue 1989) (establishing standard by which children born out of wedlock may prove paternity for purposes of intestate succession). This trend in the law, combined with the inequity of granting biological fathers of children born out of wedlock extensive rights without imposing on them corresponding responsibilities, indicates that concerns regarding the stigma of illegitimacy should not outweigh the primary purposes of the filiation statutes: identifying the biological fathers of children born out of wedlock and imposing on them an obligation of support. See, *Race v. Mrsny*, 155 Neb. 679, 53 N.W.2d 88 (1952) (the primary objective in a paternity proceeding is to secure the support of the child); *Gomez v. State ex rel. Larez*, 157 Neb. 738, 61 N.W.2d 345 (1953) (presumption that husband of mother of child at time of conception is the biological father does not deprive district courts of jurisdiction in a paternity proceeding against another man).

Not only does the defendant overstate the modern importance of preventing the "bastardization" of children, but he ignores the countervailing policy implications of his proposed interpretation.

In *Remkiewicz v. Remkiewicz*, 180 Conn. 114, 429 A.2d 833 (1980), Linda Remkiewicz gave birth to a child while married to Eldridge Harris. Subsequently, Linda Remkiewicz divorced Harris and married Edwin Remkiewicz. Edwin Remkiewicz filed an affidavit of parentage with the bureau of vital statistics to obtain a new birth certificate listing the child's surname as Remkiewicz. Until his divorce from Linda in 1975, Edwin

Remkiewicz treated the child as his own and the child regarded him as her father. When the Remkiewicz' filed for divorce, the state intervened, seeking an order of support for the child because Linda Remkiewicz was receiving welfare payments. The trial court dismissed the state's petition because Edwin Remkiewicz was neither the natural nor the adoptive parent of the child and thus not liable for her support after his divorce from the mother. The state appealed.

The Connecticut Supreme Court affirmed the trial court's decision, rejecting the state's argument that the affidavit of parentage conclusively established Edwin Remkiewicz as the child's father. The court held that the affidavit, though relevant evidence of paternity, was not conclusive and therefore subject to explanation by the party making it. In so doing, the court responded to the state's argument that the public policy against bastardizing children should prevent a court from going behind a written acknowledgment of paternity:

> In this case, however, public policy cuts two ways. The adoption statutes contained in chapter 778 of the General Statutes express a legislative intent that no person shall acquire parental status unless certain formalities are observed. A parent has rights as well as duties. If a stepfather could acquire parental rights through the simple expedient of changing his stepchild's birth certificate, all sorts of mischief could result. If the state commissioner of income maintenance wishes to impose obligations of support on persons who acknowledge paternity in writing . . . the legislature is the appropriate forum to consider his concerns.

*Remkiewicz*, 180 Conn. at 120, 429 A.2d at 836-37. See, also, *Byers v. Byers*, 618 P.2d 930 (Okla. 1980) (the fact that a stepfather takes the child into his home does not relieve the biological father of his overriding obligation of support; "adoption by acknowledgment" statute applies only to biological fathers); *Mace v. Webb*, 614 P.2d 647 (Utah 1980) (defendant not liable for support of child based on acknowledgment statute where blood tests conclusively exclude him as the natural father because the adoption statutes are the only means of establishing a father-child relationship between

blood strangers); *Chambers v. Chambers*, 43 N.C. App. 361, 258 S.E.2d 822 (1979) (legitimation statute is not intended to provide a means of circumventing the adoption statutes).

We agree with those courts which refuse to give conclusive effect to written acknowledgments of paternity based on the inconsistency of such an interpretation with the legislative policy of prescribing rigorous procedures for adoption. See Neb. Rev. Stat. § 43-101 et seq. (Reissue 1988 & Cum. Supp. 1990). Statutes relating to the same subject matter are in pari materia, and this court will construe them together so as to determine the intent of the Legislature and to maintain a consistent and sensible scheme. *Pump & Pantry, Inc. v. City of Grand Island*, 233 Neb. 191, 444 N.W.2d 312 (1989); *Georgetown Ltd. Part. v. Geotechnical Servs.*, 230 Neb. 22, 430 N.W.2d 34 (1988). Under the defendant's interpretation of § 43-1409, a person could establish a paternal relationship with a child, with all its attendant rights and responsibilities, by simply signing an acknowledgment of paternity form before a notary public. Such an interpretation not only makes it too easy to establish a permanent parent-child relationship for those wishing to do so, but also could have the effect of discouraging voluntary support of illegitimate children or stepchildren by men wishing to avoid becoming permanently obligated. See *Mace, supra*.

The plain language of § 43-1409 also fails to support the defendant's interpretation. The statute encompasses both a formal written acknowledgment of paternity and an informal acknowledgment through the performance of certain acts. Each is given the same legal effect under the statute. Thus, even without acknowledging his paternity in writing, Castillo's performance of such acts as taking J.R. into his home, treating the child as his own, and providing the boy food and clothing conclusively established him as the child's legal father under the defendant's interpretation of § 43-1409. Again, such an interpretation is flatly inconsistent with legislation imposing civil and criminal liability on stepparents who fail to support their stepchildren. See Neb. Rev. Stat. § 43-512.01 (Reissue 1988) (authorizing action against nonsupporting parent *or* stepparent of dependent child); § 28-705(1) (making it a crime

to abandon or neglect a dependent stepchild, even if the child was born out of wedlock). By requiring a stepfather to support his stepchild, the Legislature surely does not intend to confer on him permanent status as the child's legal father. See *Hickenbottom v. Hickenbottom*, 239 Neb. 579, 477 N.W.2d 8 (1991) (a stepfather has no duty to support a child after he divorces the child's mother unless he maintains an "in loco parentis" relationship).

Significantly, some state legislatures do distinguish between a formal written acknowledgment of paternity and informal acknowledgment through the performance of certain acts, according only the former the conclusive effect of a judgment. See, e.g., Conn. Gen. Stat. § 46b-172a (Supp. 1991) (written acknowledgment of paternity executed by putative father and filed with the superior court has the same force and effect as a judgment of that court); La. Civ. Code Ann. art. 209 (West. Supp. 1992) (acknowledgment of illegitimate child before a notary public eliminates necessity of child's proving paternity in a filiation proceeding). Similarly, Minnesota and Ohio provide that an acknowledgment of paternity made in writing and filed with the registrar of vital statistics by a man who marries the mother of the child after the child's birth creates a presumption of biological paternity. See Minn. Stat. § 257.55(1)(c)(1) (Supp. 1992); Ohio Rev. Code Ann. § 3111.03(A)(3)(a) (Anderson Supp. 1991). In the absence of such a distinction between formal and informal acknowledgments in the Nebraska statutes, we do not think the Legislature intended to give either form of acknowledgment conclusive effect.

Finally, the conclusion that a written acknowledgment of paternity is not binding in a filiation proceeding is supported by this court's decision in *Stratman v. Hagen*, 221 Neb. 157, 376 N.W.2d 3 (1985). There, the putative father of a child born out of wedlock petitioned for visitation with the child. Four years earlier he had specifically denied paternity in a suit by the mother for support. The parties eventually settled the first case " 'without admission of paternity.' " *Id*. at 159, 376 N.W.2d at 4. Based upon that disposition, the trial court granted the mother's motion for summary judgment in the second case and dismissed the putative father's application for visitation.

On appeal, the putative father argued that his actions since the earlier settlement established him as the child's "father" under the acknowledgment statute. This court rejected that argument, noting the absence of any judicial determination of paternity. The court specifically noted, "If it need be said, we now say that in a paternity action the court may award visitation to the alleged father *only if the court determines that the alleged father is indeed the father*." (Emphasis supplied.) *Id*. at 163, 376 N.W.2d at 7. The court concluded that because the putative father was estopped from asserting his paternity after specifically denying it in a previous case, no such judicial determination existed or could exist and thus affirmed the trial court's decision. See, also, *Timmerman v. Timmerman*, 163 Neb. 704, 81 N.W.2d 135 (1957) (the provisions of the acknowledgment statute define what may be regarded as satisfactory proof in a proceeding to establish paternity).

Enacted in an era characterized by legal hostility toward illegitimate children, during which scientific methods for determining paternity were lacking, statutes like § 43-1409 were designed to facilitate the legitimation of children born out of wedlock. See, *C.C. v. A.B.*, 406 Mass. 679, 550 N.E.2d 365 (1990); *Chambers v. Chambers*, 43 N.C. App. 361, 258 S.E.2d 822 (1979). They did so by creating a legal fiction that the child of parents who marry subsequent to the child's birth is legitimate. Recognizing that those with an interest in establishing the child's illegitimacy would question the father's paternity in such cases, these statutes armed the child and the father with evidence of a biological relationship based on the performance of certain acts. In so doing, they protected the rights associated with biological parenthood for those willing to accept its responsibilities. See *Chambers, supra*.

From all of the above, it is evident that § 43-1409 is designed to aid courts in identifying the biological fathers of children born out of wedlock. We reject the defendant's disingenuous attempt to turn the statute on its head and use it to impose upon J.R.'s stepfather obligations the defendant properly bears as the child's biological father. We therefore hold that in a filiation proceeding for support of a child born out of wedlock, evidence of the performance of acts described in § 43-1409 is not

conclusive on the trier of fact, but constitutes relevant evidence of a biological relationship. Therefore, the district court did not err as a matter of law in finding that the defendant is J.R.'s natural father.

## APPLICABILITY OF THE
## "PATERNITY BY ESTOPPEL" DOCTRINE

With regard to the remainder of the defendant's first assignment of error regarding the doctrine of "paternity by estoppel," it is argued that the doctrine requires proof of three elements: "(1) misrepresentation; (2) justifiable reliance by another; and (3) detriment." Brief for appellant at 14. The defendant goes on to argue that he satisfied these elements by showing that Castillo made numerous misrepresentations regarding his relationship to J.R., that the child relied on these misrepresentations, and that detriment to the child would occur if the State is allowed to prove the defendant is actually the child's natural father.

The doctrine of paternity by estoppel involves the application of established principles of equitable estoppel in the context of paternity determinations. See *Clevenger v. Clevenger*, 189 Cal. App. 2d 658, 11 Cal. Rptr. 707 (1961). Recently, this court noted:

> The elements of equitable estoppel are, as to the party estopped, (1) conduct which amounts to a false representation or concealment of material facts or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts; as to the other party, (4) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (5) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (6) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice.

*State v. Nebraska Assn. of Pub. Employees*, 239 Neb. 653, 659-60, 477 N.W.2d 577, 582 (1991). In general, estoppel is a bar which precludes a *party* from denying or asserting anything to the contrary of those matters established as the truth by his own deed, acts, or representations. *Jennings v. Dunning*, 232 Neb. 366, 440 N.W.2d 671 (1989).

Based on the above, the obvious weakness in the defendant's theory is that the person he alleges engaged in misrepresentations, Castillo, is not a party to this suit. See *Baker by Williams v. Williams*, 503 So. 2d 249 (Miss. 1987) (refusing to apply doctrine of res judicata to bar child's paternity suit against her mother's current husband based on the mother's position in prior divorce suit that her first husband was the father). In this important sense this case is distinguishable from many of those cited in the defendant's briefs. As the doctrine of estoppel acts to preclude a *party* to the suit from taking a position contrary to that taken previously, it is inapplicable in this case.

Not only is the doctrine of equitable estoppel technically inapplicable to this suit, but it is questionable whether the doctrine would apply even if the correct parties were present. In *Knill v. Knill*, 306 Md. 527, 510 A.2d 546 (1986), the Maryland Court of Appeals discussed the trend toward applying the doctrine in divorce suits to estop the man from denying paternity and avoiding a support obligation after holding himself out as the child's father for many years. Though recognizing cases applying the doctrine based on the emotional harm the child could suffer if paternity is denied, the court stated that the majority of courts do not apply the doctrine. Following this "majority," the court held that the doctrine applies only if the acts of the reputed father interfere with the child's ability to seek financial support from his or her natural parent, upon whom is placed the primary obligation of support. Because the parties in *Knill* always knew who the true father was and he was at all times available for process and financially able to support the child, the court refused to apply the doctrine in that case.

Here, the parties were at all times aware of the identity of J.R.'s natural father. Moreover, there is no evidence of the

defendant's unavailability or inability to fulfill his support obligations, or of Castillo in any way interfering with the child's, P.C.'s, or the State's ability to file suit against the defendant for support. The *Knill* court held that the doctrine of equitable estoppel applies only if the child suffers *financial* detriment as a result of his reliance on the reputed father's representations of paternity.

Without deciding whether this court would ever apply the doctrine of paternity by estoppel when the child has suffered no financial detriment, we hold that the doctrine is inapplicable in this case, and therefore the defendant's first assignment of error also lacks merit. Accordingly, the decision of the district court is affirmed.

AFFIRMED.